[L. A. No. 25741. In Bank. May 20, 1960.]

TYSON A. PEARSON et al., Respondents, v. STATE SOCIAL WELFARE BOARD, Appellant.

Stanley Mosk, Attorney General, B. Abbott Goldberg, Assistant Attorney General, Herschel T. Elkins, Deputy Attorney General, and Rudolf Michaels for Appellant.

Harold W. Kennedy, County Counsel (Los Angeles), Robert C. Lynch and Alister McAllister, Deputy County Counsel, as Amici Curiae, on behalf of Appellant.

Abe Mutchnik, Robert W. Kenny and David S. Smith for Respondents.

WHITE, J.—The Los Angeles County Bureau of Public Assistance terminated the old-age assistance payments of respondents Tyson A. Pearson and Ida C. Pearson effective August 31, 1957, because of their alleged failure to comply with regulations of the appellant State Social Welfare Board. The action of the county board was affirmed on appeal by the state board and request for rehearing by the state board was denied. The Pearsons then commenced this action in the superior court, pursuant to section 104.2[1] of the Welfare and

---

[1] "'If an applicant or recipient of aid under . . . this code feels himself aggrieved by any decision of the State Social Welfare Board, he may . . . file with the superior court of the county in which he resides, a petition, praying for a review of the entire proceedings in the matter, upon

Institutions Code, to review questions of law. From an adverse judgment of that court the state board has appealed.

The narrow issue presented is the validity of Regulations A-133.10 and A-133.40 of the state board, prescribing the circumstances when resources owned by applicants for or recipients of old-age assistance may be required to be utilized through the sale thereof, as measured by the provisions of section 2164 of the Welfare and Institutions Code. (Unless otherwise noted all references in this opinion are to that code.)

Section 2164 provides that: "No aid under this chapter shall be granted or paid to any person who owns real property the assessed value of which as assessed by the county assessor, less all encumbrances thereon of record, exceeds *five thousand dollars ($5000)*. Real property owned but not occupied as a home by an applicant or recipient *shall be utilized* to provide for the needs of the applicant or recipient." (Emphasis added.)

A broader issue on this appeal, necessary to a determination of the legislative intent in enacting section 2164, is the determination of the interrelation of this section with other pertinent provisions of the state Old Age Security Law (§§ 2000 et seq.) and with pertinent provisions of the old-age assistance provisions of the federal Social Security Act (49 Stat. 620 (1935), 42 U.S.C. § 300 et seq.) ▮ This court takes judicial notice of the public policy of this state to establish and to maintain conformity between the state law and the requirements of the federal act for the receipt of grants-in-aid in support of the state public assistance program. The issues presented herein affect not only the federally-approved state plan with reference to the needy aged but also affect the provisions relating to the needy blind and aid to needy children, matters which are of tremendous financial and social consequence to this state.

We have concluded that the record of the proceedings before the state board, filed herein as its return to the petition for review, shows no abuse of discretion in applying Regulations A-133.10 and A-133.40 to the Pearsons. If these regulations are otherwise valid and according to law, the failure of the Pearsons to comply therewith supports the curtailment of their old-age assistance payments.

questions of law involved in the case. Such review, if granted, is a distinct and cumulative remedy. The State Social Welfare Board shall be the sole respondent in such proceedings."

Regulation A-133.10 defines "Utilization" as follows:

"Real property is utilized when it is making a reasonable contribution toward current needs, when a plan for its use supports a conclusion that it will so contribute in the immediate future, *or when it is sold* for an amount consistent with its current market value and the plan and terms of sale are consistent with the requirements of reasonable contribution toward current needs. [Emphasis added.]

"Sale is not a reasonable plan of utilization if:

"1. The property is a multiple dwelling, one unit of which is used as the recipient's home, or

"2. The net proceeds the recipient could reasonably expect to realize from the sale, together with other personal property, would not exceed $1,200 (or the combined holdings of the couple so determined would not exceed $2,000 if the owner is living with a spouse who is also a recipient)."

Regulation A-133.40 states the requirements of recipient action toward utilization as follows:

"The recipient is given a reasonable period in which to initiate a plan for utilization of property not already being utilized in some acceptable way . . . this period is three months from the date the recipient was advised of the utilization requirement . . . the period may be extended if circumstances beyond his control prevent the owner from proceeding with his plan. When a recipient has made no effort to utilize his property by the expiration of a reasonable period, ineligibility results.

"An applicant or recipient who refuses to consider development of a plan for utilization becomes ineligible immediately.

"Until an acceptable method of utilization is found, all reasonable methods must be attempted and the recipient is given one year (including the initial three-month period) in which to develop such an acceptable method of utilization. This period may be extended if there are extenuating circumstances which support a conclusion that a successful method of utilization can and will be developed within six months following expiration of the one-year period."

The Pearsons are husband and wife, now aged respectively 82 and 79 years. In 1957 they were recipients of old-age assistance as needy aged residents of Los Angeles County pursuant to provisions of county, state and federal law. For over 34 years they have owned three parcels of property aggregating 1,000 acres of unimproved desert land near Victorville in San Bernardino County. During most of this time their land has had little, if any, income-producing or market worth.

In recent years, however, there has been a shift of land usage from desert grazing to prospective residential use, due to the location of aircraft plants and air force bases and also due to plans for a Feather River Project which would provide water to the area. It is economically unfeasible under present conditions to develop the water underlying the property for agricultural purposes.

In January 1957 when the Pearsons made their annual affirmation of eligibility at the office of the county board they were advised of the law requiring that real property be utilized to meet the needs of old age security[2] and were told that there would be a period of three months allowed them to make a plan for utilization. They were told that every effort must be made to sell the property at a reasonable amount and that the property should be listed with at least three real estate brokers. On several occasions Mr. Pearson advised the county board that he had listed the property with three real estate brokers at Victorville, naming them. Upon inquiry by the county board, two of these brokers replied that the property had not been listed with them but that they would be glad to list it. The third did not reply. Prior thereto the county had received estimates of market value of the Pearson property from these brokers, ranging from an estimate of $65 an acre by Mr. E. S. Goble, $100 an acre by Mr. Paul Herre, and $125 to $150 an acre by Mr. Wheeler Sells, or an average estimate of $96 per acre. The county, being unable to verify that the Pearsons were making a reasonable effort to utilize their real property not used as a home discontinued their assistance payments effective August 31, 1957.

At a hearing before the referee of the state board on appeal Mr. Pearson admitted that Mr. Goble had offered to list the property at $60 to $65 an acre, and that he had refused an offer of $300 an acre from another party because the deferred payment plan offered was not acceptable. He had negotiated with various brokers for the sale of this property but was unwilling to enter into a written agreement for the sale of the property at a stated price or to enter into a written agreement for the payment of a stated commission. He was of the opinion that he and his wife should get at least $200 an acre for the land, indicating, however, that they might accept less. He stated that if $96 an acre was a legitimate figure this might be acceptable but he did not think that these realtors were

[2]The state plan uses the words ''Old Age Security,'' the federal act uses the words ''Old-Age Assistance,'' but the meanings are the same.

putting their best price on the land. He informed the county board that he and his wife were willing to give an exclusive listing at $200 an acre to a broker whose name he preferred not to disclose. Subsequent to the hearing he advised that they had made such a listing.

The county board felt that the failure of the Pearsons to make a formal listing at a given price per acre with three recognized brokers indicated that they were not making a bona fide effort to carry out a plan of utilization of this property. The Pearsons felt that they had in effect listed the property for sale because they had talked about it to brokers generally and had discussed the amount of money they had hoped to receive from the net proceeds of sale. The state board agreed with the county that a listing at $200 an acre was not a realistic compliance with the utilization requirements of the state board's regulations, because the price was almost double the market value established by the appraisals of three reputable real estate brokers and the conditions and restrictions laid down by the Pearsons precluded a sale. It also agreed with the county that the Pearsons were not "needy" individuals when they owned property with an estimated market value of $96,000; that the continuing of old age security payments to them was not consistent with the legal requirement that aid be paid only to needy individuals, as set forth in sections 19 and 2001, and that holding this land for speculative purposes was not consistent with a bona fide effort to utilize it. The state board found that a reasonable time had been given to the Pearsons to make and develop a plan for utilization, and that neither prior to the hearing nor subsequent thereto had they made a bona fide effort to carry out their plan of sale.

In their petition to the state board for rehearing the Pearsons urged that $96 an acre was not a fair or reasonable price, and that the low valuation made by the three appraisers was based on a valuation of "desert, waterless land. They had no knowledge of the true conditions and that this land is surrounded by good water wells. Why! Goble came to us and wanted an exclusive at $65 an acre, and failing to get it he wrote to us for one at $150 an acre . . . I have been advised that $200 is a 'steal' for an honest buyer. . . . Two whole sections of land nearby, inferior to our land in every way, sold for $250.00 an acre; while a 40 acre piece a very few miles away was bought by a real estate broker for $800 an acre. . . . We cannot agree, however, with the Board's requirement that we must sell the land for $96,000 without regard to its real value." It is apparent from the record that the Pearsons

have never denied, and in fact have strongly urged, that their land is very valuable.

In their petition to the state board for rehearing the Pearsons urged, as issues of law, that the regulations of the board were contrary to law because the word "utilized" in section 2164 requires only that the property be put to use, as in producing income and excludes the idea of a sale; and that the "sole ground on which our aid could be cut off because of holding this land while it cannot be fully utilized would be that its assessed value, less all encumbrances thereon, has become more than $3,500.00 or such amount as is permissible by law." (The 1957 amendment to section 2164 increased this to $5,000.) They specifically relied upon and quoted from the decision of the Superior Court of Los Angeles County in the unreported case of *Trujillo* v. *State Social Welfare Board*, L. A. No. 654454 (June 1956), in urging that the regulations of the state board and the discontinuance of the Pearsons' assistance were "against the law."

In the present proceeding the trial court found, as conclusions of law from the record of the proceedings before the board, that any rules or regulations adopted and enforced by the board which required the Pearsons to offer any of their real property for sale were inconsistent with the provisions of section 2164; that the Pearsons did not become ineligible for old age security assistance payments by reason of their having failed to sell all or a portion of their real property, the assessed value of the entire property being less than $5,000; that the utilization requirement set forth in section 2164 does not authorize the board to require the Pearsons to sell their property "since the word 'utilize' is inconsistent in law with the words 'sell' or 'sale';" and that the discontinuance of such payments by the board was against the law. It thereupon ordered these payments restored as of September 1, 1957, and awarded attorney's fees in the sum of $250, as provided for under the provisions of section 104.3.

The memorandum opinion of the trial court further clarifies its interpretation of section 2164. It poses the crucial question as being "does the requirement of 'utilization' of non-occupied real property encompass the necessity of sale thereof to provide for the recipient's needs?" and answers this in the negative. In so doing it relies upon the dictionary definitions of "utilize," namely, *"to make useful; to turn to profitable account or use; to make use of; . . ."* (emphasis added) (Webster's New International Dictionary, 2d ed.) and cites

two decisions which interpret the word "use" as excluding "sale" when applied to the power of a person who has a life interest in property (*Hardy* v. *Mayhew,* 158 Cal. 95, 102 [110 P. 113, 139 Am.St.Rep. 73]; *McAllister* v. *Long,* 206 Okla. 623 [246 P.2d 352]). The trial court further reasoned that "the addition of the last [second] sentence to section 2164 by the 1950 amendment thereof indicates a clear legislative intent of harmonious treatment of occupied and non-occupied property owned by said recipients. If occupied as a home it is 'utilized' by such continuing occupation, and if it is not occupied it is to be put to profitable continuing use so that the return therefrom, in lieu of the value of the recipient's occupancy, can be applied to the recipient's needs.''

Appellant state board urges that the trial court did not fully apply the dictionary definition quoted by it and that the cases referred to by the trial court are not applicable to this situation. It further points out that the provisions of section 2164 are not clear and free from ambiguity and therefore resort should have been had by the court to such extrinsic aids to statutory construction as the history and purpose of section 2164 and of other statutes in pari materia; to the contemporaneous, consistent and continuing administrative construction of this section by the state board and the ratification of that construction by the state Legislature; to the purposes and objectives of the pertinent state and federal acts on the subject of old-age assistance, of which section 2164 is an integral part; to the regulations of the federal Social Security Administration, particularly as to the criteria which must be applied in determining the "need" of a recipient; to the necessity for federal approval of the state plan in order for the state to participate in the benefits provided by the federal Social Security Act; to the necessity for continuing state compliance with these federal laws and regulations and to the desire and purpose of the California Legislature to so comply; and that in considering the possible interpretations of this statute the court might well have pondered what would be the consequences of declaring invalid Regulations A-133.10 and A-133.40 of the State Social Welfare Board.

■ The interpretation of a statute may well begin, but should not end, with a dictionary definition of a single word used therein. ■ A word is ". . . 9. An articulate sound, or series of sounds which, through conventional association with some fixed meaning, symbolizes and communicates an idea, without being divisible into smaller units capable of

independent use; that is, the smallest unit of speech that has meaning when taken by itself; . . ." (Webster's New International Dictionary, 2d ed.) ▮ A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, and it may take on values from the words and ideas with which it is associated. Words are the product of history and their meaning may change with time, place and social group. ▮ As expressed by Mr. Justice Holmes in *Towne* v. *Eisner*, 245 U.S. 418, 425 [38 S.Ct. 158, 62 L.Ed. 372]; "A 'word' is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." ▮ Words used in a statute may, as applied to the words with which they are combined and to the words with which they were intended to be related, have connotations which they might not have when used in context with, or in relation to, other language or where used to express a different purpose.

Illustrative of the rule with regard to statutory construction is the language of this court in *People* v. *Knowles*, 35 Cal. 2d 175, 182 [217 P.2d 1], as follows: "An insistence upon judicial regard for the words of a statute does not imply that they are like words in a dictionary, to be read with no ranging of the mind. They are no longer at rest in their alphabetical bins. Released, combined in phrases that imperfectly communicate the thoughts of one man to another, they challenge men to give them more than passive reading, to consider well their context, to ponder what may be their consequences. Speculation cuts brush with the pertinent question: what purpose did the Legislature seek to express as it strung those words into a statute? The court turns first to the words themselves for the answer. It may also properly rely on extrinsic aids, the history of the statute, the legislative debates, committee reports, statements to the voters on initiative and referendum measures. Primarily, however, the words, in arrangement that superimposes the purposes of the Legislature upon their dictionary meaning, stand in immobilized sentry, reminders that whether their arrangement was wisdom or folly, it was wittingly undertaken and not to be disregarded."

▮ Considering the word "utilized," it cannot be reasonably held, either from the viewpoint of semantics or logic, that the idea of a "sale" is excluded or is repugnant under all circumstances. The factual situation here is that the Pearsons were absolute owners of this land. It is compatible with

the idea of the "use" or the putting "to a profitable account" of one's own property that one may sell it, particularly where no other methods of utilizing it for one's needs appear. ▮ The idea of "use" may connote the idea of "consume" or "use up" (Roget's Int. Thesaurus of English Words and Phrases, 1931 Mawson ed.) in proper circumstances. If the owner sells it he does not merely "use up" the land, he receives a *quid pro quo* or its equivalent in money's worth. Concededly "sale" would not be correlative to the idea of "use" in the example posed by the Pearsons, where one lends his lawnmower to a neighbor "to use." ▮ Likewise, the use or utilization of property by an owner of a limited interest, such as a bailee, lessee, mortgagee, or life tenant, would not carry with it the right of sale unless such right were expressly given. It is with the use of property by owners of limited interests, with tax statutes distinguishing between "use" and "sale," or with penal statutes proscribing a "use" of building and the interpretation of a single sale as not constituting such a prohibited use, that the cases cited by the Pearsons and the trial court are concerned. They are not therefore applicable to the problem with which we are here confronted.

The Pearsons urge that if the word utilized is interpreted to include the requirement of a sale of their real property assessed at less than $5,000 this creates a conflict between the two sentences in section 2164, and the rule should be applied that "Where possible, all parts of a statute should be read together and considered to achieve harmony between seemingly conflicting provisions, rather than holding that there is an irreconcilable inconsistency." (*Wemyss* v. *Superior Court*, 38 Cal.2d 616, 621 [241 P.2d 525].) It is their contention that under the first sentence of section 2164 the Legislature has unequivocally declared that the recipients may continue to own real property assessed up to the amount there stated and that the recipients may not, by reason of such ownership, be denied assistance payments. They contend, further, that if under the second sentence they may be required, in order to remain eligible for assistance payments, to sell the property which the first sentence allows them to retain, there is a patent contradiction and conflict between these two sentences. Interpreting the word utilized in the second sentence as excluding the idea of a sale would, they contend, achieve harmony between these two provisions and they urge that it be so construed.

▮ It does not appear, however, that these sentences are irreconcilably inconsistent if they are interpreted to support

Regulations A-133.10 and A-133.40 of the state board. The statute provides dual standards for eligibility but they are not necessarily in conflict. The first sentence does not make recipients who own less than the statutory maximum eligible for assistance absolutely and in all events. It forbids payment to those who own more. It does not require payment to those who own less. The second sentence requires that real property not used as a home must be utilized. Where no practical use other than sale presents itself, a sale would appear to be contemplated by this act. The regulations of the board do not require that a sale must be made. They do require that the recipient make a continuous and bona fide effort to sell, and that a bona fide effort requires the placing of a realistic price on the property. To claim, as do respondents herein, that one should remain eligible for old-age assistance as a needy aged person while retaining ownership of a valuable resource, with a potential market value of $96,000, challenges credulity and does violence to reason. It also misconstrues the purposes and intent of this section.

Cogent to a consideration of the language of section 2164 with which we are here concerned is *Newbold* v. *Social Welfare Board* (1946), 76 Cal.App.2d 844 [174 P.2d 482], involving as it does the construction of a statute *in pari materia*, section 3047 relating to aid to the needy blind, and validity of regulations of the state board. The court at pages 846-847 of the case just cited says:

". . . section 3047 of the Welfare and Institutions Code . . . provides: 'Aid shall not be received under the provisions of this chapter by any person who owns personal or real property, or both, the county assessed valuation of which, less all encumbrances thereon of record, is in excess of three thousand dollars.' It is . . . argued that the plain meaning of this statute is that any blind person who owns not to exceed $3,000 in personal property is eligible for blind aid and cannot be excluded from the benefits of such aid insofar as any property qualification is concerned. In other words, it is contended that such a person is entitled to such aid regardless of any circumstances surrounding the possession or possible use of such funds, and that no discretion in this regard is left to the boards in charge of administering such aid.

"We think this contention not only misconstrues the purpose and intent of section 3047 but ignores and leaves out of consideration the effect of other provisions . . . covering the matter of aid to the needy blind. . . . *While this [section*

*3047*] *declares the ineligibility of those having property beyond this limit* [*$3,000*], *it neither expressly makes eligible one having property up to that amount, nor declares that the ownership of property up to that limit shall be disregarded in passing upon other necessary qualifications of such an applicant, including the basic one of his need for such aid.* The amount thus fixed by section 3047, beyond which an applicant becomes ineligible for such aid, seems to have been intended as a maximum amount which the board, in exercising its discretion in view of other circumstances, may allow an applicant to retain in any case, and not a standard or fixed amount which an applicant must be allowed to retain in any event, regardless of other considerations.'' (Emphasis added.)

Again on page 849 the court states: ''. . . While the language of the statutes is not as clear as might be desired we think it also sufficiently appears, from a consideration of this legislation in its entirety, that while it was intended to give the administering boards some leeway in individual cases, without a requirement that an applicant must use up his last dollar of assets before being considered unable to provide for himself, it was further intended by section 3047 to fix an outside limit upon the amount of assets which an applicant might be permitted to retain, *and that it was not intended thereby to fix an amount which must be allowed to an applicant in all cases and without regard to the surrounding circumstances. . . .*'' (Emphasis added.)

A contrary interpretation of the provisions of section 2164 was made in the following cases relied upon by the respondents, *Macomber* v. *State Social Welfare Board* (Nov. 1959), 175 Cal.App.2d 614 [346 P.2d 808], and two unreported superior court decisions, *Putnam* v. *State Social Welfare Board* (June 1958), San Diego County No. 223,084, and *Trujillo* v. *State Social Welfare Board, supra* (June 1956), Los Angeles County No. 654454. However, these decisions, as well as that of the trial court herein, rely on the same basic fallacy as that pointed out in the Newbold decision. They interpret the first sentence of the statute as an absolute grant of eligibility to persons having property assessed at less than the statutory maximum. Also, they base their interpretation of the statute on a limited application of a dictionary definition; they rely on cases which do not relate to the use by an absolute owner of his own land nor to the requirement that one utilize his own resources before becoming or remaining eligible for public assistance benefits, and they fail to consider the intention of the Legislature as demonstrated in other

relevant sections of the law and with which the construction of this statute may, and should, be harmonized.

 Section 2164 expressly refers to aid "under this chapter." This section appears in the Welfare and Institutions Code as part of chapter 1 (§§ 2000 et seq.) entitled "Old Age Security Law" (Cal. Stats. 1937, ch. 375, p. 1185) under Division III of that code entitled "Aged Persons." The provisions of chapter 1 are based on the California Old Age Security Law, originally enacted in 1929 (Cal. Stats. 1929, ch. 530, p. 914). In 1937 there was a general revision of this act and a codification of welfare and related statutes in the newly created Welfare and Institutions Code (Cal. Stats. 1937, ch. 369, p. 1005), effective May 25, 1937.

The title of the 1929 act stated that it was "to provide for the protection, welfare and assistance of aged persons *in need* and resident in the State of California. . . ." (Emphasis added.) Section 1 of the 1929 act provided that "Subject to the provisions of this act, every person residing in the State of California, *if in need*, shall be entitled to aid in old age from the state." (Emphasis added.) This was codified as section 2001 of the Welfare and Institutions Code when that code was adopted in 1937. As amended in 1957 section 2001 now provides that "Every person residing in the State, if qualified under this chapter, shall be entitled to aid in old age from the State." However, section 19 restates the continuing legislative intent that "The purpose of this code is to provide for protection, care, and assistance to the people of the State *in need thereof,* and to promote the welfare and happiness of all of the people of the State by providing public assistance to all of its *needy* and distressed. . . ." (Emphasis added.) Section 2004 (formerly § 2009 of the Welfare and Institutions Code) provides with emphasis that *"No person receiving aid under the provisions of this chapter shall be deemed a pauper or an indigent by reason thereof."* While this indicates a public purpose that the measure of need shall not be a state of pauperism, the basic criteria remains that an aged person in this state must be "in need" in order to be eligible for assistance from public funds.

The 1929 act provided, in section 3, that the amount of aid to which any person shall be entitled "shall be fixed with due regard to the conditions existing in each case, but in no case shall it be an amount which, when added to the income of the applicant from all other sources, including income from property computed under the terms of this act, shall exceed a total

of one dollar per day.'' Section 4 of the 1929 act upon which section 2164 of the Welfare and Institutions Code is based, provided that ''Aid under this act shall not be granted or paid to any person the value of whose property, or, if married, the value of the combined property of husband and wife, at the time of such application exceeds three thousand dollars.'' Section 5 of the 1929 act provided that the income of the applicant ''shall be computed on the basis of an average income during the twelve months next preceding the date of such application; the annual income of any property of applicant which does not produce a reasonable income shall be computed at five per cent of the value of such property.''

In 1935 the California Old Age Security Act was revised extensively. As stated in the Biennial Report, 1934-1936, of the State Department of Social Welfare, p. 22[3] ''In the legislative session of 1935, widespread national interest in old age security programs was reflected in numerous proposals introduced and finally enacted. The Social Security Act was under consideration in Congress and the California Legislature planned for the future by providing amendments to the Old Age Security Act that would enable the state to take advantage of the federal subsidy when it should become available, by action of the governor, without necessitating further action of the legislature. With this in mind, the act was amended reducing the age of eligibility to sixty-five and further providing that if, when, and during such time as federal aid was available the state residence requirements would be reduced to five years within the last nine. The governor was authorized to enter into the necessary agreements with the federal government.'' By April 1, 1936, the necessary agreement with the federal government had been completed and the federal Social Security Act went into effect.

Title I of the federal Social Security Act has always provided in subchapter 1, entitled ''Grants to States for Old-Age Assistance'' that ''For the purpose of enabling each State to furnish financial assistance, as far as practicable under the conditions in such State, to *aged needy* individuals . . .'' (emphasis added), there is authorized to be appropriated for

---

[3]Printed in Appendix to Journals of Senate and Assembly-California, 52d Session 1937, 53d Session 1939, Vol. 2, Reports, Department of Social Welfare 1934-1936, p. 22; see also Report, 1936-1938, p. 11; Assembly Joint Resolution No. 1, filed Sept. 13, 1934 (Stats. 1935, p. 37) and Assembly and Senate Concurrent Resolution (no number) filed January 16, 1935 (Cal. Stats. 1935, p. 2306), memorializing the Congress and the President of the United States to enact legislation for a national system of old age pensions and old age security.

each fiscal year a sum sufficient to carry out the purposes of Title I and that the sums made available under this section "shall be used for making payments *to States which have submitted, and had approved . . . State plans for old-age assistance.*" (Emphasis added.) (Aug. 14, 1935, ch. 531, tit. I, § 1, 49 Stat. 620; 1946 Reorg. Plan No. 2, § 4, eff. July 16, 1946, 11 F. R. 7873, 60 Stat. 1095; Aug. 28, 1950, ch. 809, tit. III, pt. 1, § 361(a), 64 Stat. 558; 1953 Reorg. Plan No. 1, §§ 5, 8, eff. Apr. 11, 1953, 18 F. R. 2053, 67 Stat. 631; Aug. 1, 1956, ch. 836, tit. III, § 311 (a), 70 Stat. 848; 42 U.S.C. § 301.) For convenience references to this act will be made to the sections as they appear in the United States Code. Basic elements of this federal act are clearly the requirement that the recipient be a "needy aged" individual, and that a state plan for participating in federal funds and cooperating with the federal act must be approved by the administrators of the federal act (now the Department of Health, Education and Welfare, Social Security Administration), before federal funds may be received by a state for old-age assistance.

Section 2 of title I (42 U.S.C. § 302) has always required that "(a) A State plan for old-age assistance must (1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them; (2) provide for financial participation by the State; (3) either provide for the establishment or designation of a single State agency to administer the plan, or provide for the establishment or designation of a single State agency to supervise the administration of the plan." Clause (4) of subdivision (a) of section 2 of title I has always required that there must be an opportunity for a fair hearing before a state agency, where an individual's claim for old-age assistance is denied; this clause and subsequent clauses of subdivision (a) of section 2 have been amended or added by amendment of the federal Social Security Act. (See history of changes in annotation to 42 U.S.C. § 302.)

In 1935 California made extensive changes in its Old Age Security Act of 1929 to comply with the requirements of the federal Social Security Act. Among these was the repeal of section 5 and the amendment of section 4 of the state act to provide that the maximum property which an applicant could hold was $3,000 assessed value (in lieu of the former standard of market value), thus practically doubling the effective amount. Another important change was in residence requirements. California law required 15 years residence preceding

the date of application (Cal. Stats. 1929, ch. 530, §§ 2, 13, pp. 914, 917, as amended). Under section 2 (b) (2) of title I of the federal Social Security Act (42 U.S.C. § 302 (b) (2)) a state plan may not be approved which imposes as a condition of eligibility ''Any residence requirement which excludes any resident of the State who has resided therein five years during the nine years immediately preceding the application for old-age assistance and has resided therein continuously for one year immediately preceding the application.'' The California act was amended to conform to this requirement during such time as the state accepts such federal aid. (Welf. & Inst. Code, § 2160, subd. (c), (1) and (2); Cal. Stats. 1935, ch. 633, §§ 1, 6, pp. 1767, 1770; Stats. Ex. Sess. 1939, ch. 7, §§ 1, 3, pp. 11, 12.) The California act has since been amended at succeeding sessions of the California Legislature.

In 1939 a far-reaching change was made in the federal act. Clause (7) was added to subdivision (a) of section 2 of title I (42 U.S.C. § 302 (a) (7)) to provide that *a State plan for old-age assistance must '' (7)* effective July 1, 1941, *provide that the State agency shall, in determining need, take into consideration any other income and resources of an individual claiming old-age assistance.''* (Emphasis added.) The clear import of this amendment is emphasized by congressional committee reports relating thereto as follows: ''Under this clause the State plan must provide that the State agency shall, in determining need, take into consideration any income and resources of an individual claiming old-age assistance. This will make it clear that, regardless of its nature or source, any income or resources will have to be considered, including ordinary income from business or private sources, Federal benefit insurance payments under title II of the Social Security Act and any other asset or means of support. The committee recommends this change to provide greater assurance that the limited amounts available for old-age assistance in the States will be distributed only among those actually in need on as equitable a basis as possible.'' (H.R. Rep. No. 128, 76th Cong. 1st Sess. 33 (1939); S. Rep. No. 734, 76th Cong. 1st Sess. 40 (1939).)

This amendment necessitated changes in the California plan for old-age assistance.[4] While these changes were not wel-

---

[4] See 1941 Journal of Assembly, Vol. 1, p. 1008, Letter of Oscar M. Powell, Executive Director, Social Security Board, dated March 3, 1941, to the Honorable Culbert L. Olson, Governor of California; Vol. 1, p. 1595, Letter from Director Powell to Honorable Jerry Voorhis, House of Representatives, March 25, 1941.

comed by the California Legislature[5] the pertinent fact remains, of statutory record, that they were made. The legislative history of these changes discloses that they were made to conform to requirements of the administrators of the federal Social Security Act.

Among the 1941 amendments to the California law was the amendment of section 2020 of the Welfare and Institutions Code. Theretofore (as amended in 1939) this section had read: "The amount of aid to which any applicant shall be entitled shall be, when added to the income of the applicant from all other sources, thirty-five dollars per month. The value of the use and occupancy of premises owned and occupied by applicants shall not be deemed income.. Net income from any of the following sources . . . not exceeding fifteen dollars per month shall not be considered for any purpose. . . ." (Cal. Stats. 1939, ch. 719, p. 2239.) The 1941 amendment provided that "The amount of aid to which any applicant shall be entitled shall be, when added to the income (including the value of currently used resources, but excepting casual income and *inconsequential resources*) of the applicant from all other sources . . .($40) per month. If, however, in any case it is found the actual need of an applicant exceeds . . . ($40.00) per month such applicant shall be entitled to receive aid in an amount not to exceed . . . ($40.00) per month which, when added to his income (including the value of currently used resources, but excepting casual income and

[5]See Senate Conc. Res. No. 16, Stats. 1941, p. 3479, filed May 22, 1941; Assembly Joint Res. No. 2, Stats. 1941, p. 3304, filed Jan. 27, 1941; Assembly Joint Res. No. 11, Stats. 1943, p. 74, filed Jan. 16, 1942. The latter resolution provides in part: "Whereas, Certain amendments to Section 2(a) of Title I of the Federal Social Security Act, approved August 10, 1939, and effective July 1, 1941, require that the State agency administering old age assistance shall, in determining need, take into consideration any other income and resources of an individual claiming old age-assistance; *and the enactment of these amendments forced the State of California, with the greatest reluctance, to amend the Old Age Security Law of the State of California in accordance therewith*; and . . ." (Emphasis added.) These resolutions related to the questions of exempting income, and the required deletions of the provisions of the California statute (Welf. & Inst. Code, § 2020) regarding such exemption. The 1943 Legislature enacted section 2020.05 of the Welfare and Institutions Code (Cal. Stats. 1943, ch. 358, p. 1583) which reads: "For the purposes of Section 2020, earnings of an applicant shall not be deemed income or resources of the applicant, and shall not be deducted from the amount of aid to which the applicant would otherwise be entitled.

"This section shall take effect if and when amendment to the Federal statute or rules and regulations of the Federal Social Security Board take effect permitting this State to give effect to this section without thereby rendering this State ineligible to receive federal grants-in-aid for old age assistance in this State."

*inconsequential resources* from all other sources), shall equal his actual need." (Emphasis added.) (Cal. Stats. 1941, ch. 764, p. 2300.)

In 1949 by an initiative constitutional amendment Proposition 4 (Cal. Stats. 1949, p. cli) added article XXV to the state Constitution. The last paragraph of section 6 of Proposition 4 repeated what had been the substance of section 2164 of the Welfare and Institutions Code.[6] As a result of this amendment to the Constitution, a new California plan was required to be filed and approved pursuant to section 1 of title I of the Federal Social Security Act (42 U.S.C. § 301.)

There is in the California government a Department of Social Welfare (Welf. & Inst. Code, § 100). It is comprised of the state Social Welfare Board, the Director of the Department of Social Welfare, and such divisions as are necessary for proper administration (Welf. & Inst. Code, § 101). The Social Welfare Board is required to advise the director in the performance of his duties and by regulation to formulate general policies affecting the purposes, responsibilities and jurisdiction of the department; it is empowered and required to adopt, revise, repeal and amend rules and regulations which are consistent with law and reasonably necessary for the administration of welfare; and, except as otherwise provided by law, it is required to establish minimum standards of public assistance, not in conflict with law, for all relief purposes for which state grants-in-aid are made to the counties. (Welf. & Inst. Code, § 103.) The department is required to supervise the administration of state aid to all persons receiving or eligible to receive state aid (Welf. & Inst. Code, § 113). It is specifically authorized by the California Legislature to cooperate with the federal government, as follows: "The department may act as the agent or representative of or cooperate with the Federal Government in any matters within the scope of the functions of the department, for the administration of Federal funds granted to this State or for any other purpose in furtherance of these functions. . . ." (Welf. & Inst. Code, § 120.) Its functions may include the administration and the supervision of the administration of public assistance within this state as an agent of the federal government. (Welf. & Inst. Code, § 120.5.) It is required to make a full and com-

---

[6]In 1943 section 2164 was amended to add "less all encumbrances thereon of record." (Cal. Stats. 1943, ch. 358, p. 1586.) In 1947 it was amended to increase the statutory amount to $5,000 county assessed value. (Stats. 1947, ch. 1207, p. 2717.)

plete report to the governor prior to each *annual* session of the Legislature, with suggestions and recommendations for legislative and executive action. (Welf. & Inst. Code, § 123.)

All of these provisions of the Welfare and Institutions Code were in effect in 1949. Mrs. Myrtle Williams was at that time the Director of the California State Department of Social Welfare. On February 8, 1949, she received a telegram from Mrs. Azile H. Aaron, Regional Representative of the federal Bureau of Public Assistance, which administers federal responsibilities toward the states in the area of public assistance, advising, with reference to the California law, that it was "necessary for agency [the California State Department of Social Welfare] to give assurances and develop plan material that the maximum reserve of $3500 relates to one home for recipient and family *and that plan be developed for property reserves not utilized as a home to be converted to liquid assets within specified period.* In order to meet these requirements in minimum time, have suggested . . . meeting . . . to formulate draft material for agency's approval and submittal as revised plan material meeting federal requirements. . . ." (Emphasis added.) This telegram related to proposed bulletins submitted by the California State Department of Social Welfare for federal approval.

In response thereto, in May 1949, Mrs. Williams presented for federal review a proposed bulletin of the California State Department of Social Welfare which would have provided in part as follows: "*The Social Security Administration's definition of a needy person requires that all real property must be considered as a resource to be utilized in meeting the needs of applicants or recipients.* Therefore, all real property, except as qualified below, not used as a home by the applicant or recipient, and which does not produce a reasonable net income, shall be considered a resource that must be used to meet the needs of the individual even though it falls within the $3500 statutory maximum (county assessed value less all encumbrances of record)." Apparently this bulletin was not issued by the California State Department of Social Welfare. On January 31, 1950, Bulletin No. 402 was issued by it which provided in part that "*Real property not used as a home even though total holdings are within the $3500 net county assessed value, must be utilized for current or future identifiable needs as necessary to meet Federal requirements* will be issued in a later bulletin." (Note: Bulletin 402 is incorporated in the Preliminary Report of the Senate Interim Committee on Social

Welfare printed in the Appendix to Journal of Senate-California Regular Session, etc. 1950.)

One month later, on February 21, 1950, Bulletin 404 was issued which provided (1) that all real property even that within the statutory maximum had to be considered a resource; (2) that a reserve of $1,500 of real and personal property could be retained by a recipient; and (3) that real property not used as a home, or not producing income, and of a value which would cause the permissible reserve to be exceeded, must be utilized to meet the recipient's needs. However, this was not acceptable to the federal Social Security Administration because it referred to the "net assessed value of real property." The objective of the federal policy was to "determine the actual amount of money that could be made available to the individual from the conversion of this particular type of property." (Letter of February 27, 1950, to Mrs. Myrtle Williams from Mrs. Azile H. Aaron.)

Meanwhile, article XXV of the California Constitution was repealed by another initiative constitutional amendment, Proposition 2, which became operative on March 1, 1950, as article XXVII (Cal. Stats. 1950, p. cxxvi), and is still in effect. Section 2 of article XXVII provides that "All provisions of this Constitution which were repealed by Article XXV of amendment to this Constitution because they were in conflict therewith, if any, are hereby re-enacted, revived and declared to be fully and completely effective." Section 3 provides, in subdivision (b) thereof, that all of the provisions of chapter 1 of division 3, and other chapters and divisions specifically referred to, of the Welfare and Institutions Code "are hereby re-enacted, revived and declared to be fully and completely effective." Section 4 specifically amends section 2020 of the Welfare and Institutions Code by increasing the amount of aid allowed to $75 per month.[7]

In 1950 Charles I. Schottland replaced Mrs. Williams as Director of the California State Department of Social Welfare. On March 9, 1950, he advised Mrs. Azile H. Aaron that "The [California] administration will introduce legislation covering the eligibility requirements as to need from the personal and real property standpoint in accordance with your

[7]As amended in 1959 section 2020 now provides that "The amount of aid to which any applicant shall be entitled *for basic needs* shall be, when added to the income (including the value of currently used resources, but excepting casual income and inconsequential resources) of the applicant from all other sources" $95 per month. (Emphasis added by the Legislature.) Cal. Stats. 1959, ch. 2150, pp. 5195-5196, ch. 2151, p. 5197.

requirements. We have taken into consideration in the draft of this legislation the points you make in your letters of February 27 and 28, as well as the point made in the letter of February 17. Further action in this area will, of course, depend on legislative action, but that will undoubtedly be prompt, and we should have a legal basis and regulations implementing the legal provisions complete by July 1.'' This letter also advised ''The staff will also expect to plan with you after the close of the legislative session the way in which plan material should be rewritten.'' On March 13, 1950, he received a letter from Mrs. Aaron confirming and supplementing their prior correspondence and relating to the ''essentials in the determination of need that are necessary for an approvable State plan under the requirements in the Social Security Act that 'the State agency shall, in determining need, take into consideration any other income and resources of an individual claiming old-age assistance.' '' This letter goes on to state, ''Your Board has given assurance that the work of preparing and adopting the policies, rules and regulations embodying these changes will proceed expeditiously and this assurance enabled the Commissioner of Social Security to approve the plans. In our discussions . . . we reviewed with you certain proposals of your Department for legislation which appear to be essential to remove doubts regarding the legal basis for the existing plans for old-age assistance and aid to the blind. The proposals were to be revised in the light of these discussions. . . . Needless to say we share your concern that legislation along these lines be enacted at the current special legislative session adequate to allay any doubts regarding the continuing authority of the State Social Welfare Department to maintain plans meeting the requirements under which Federal grants-in-aid are made available.''

On March 15, 1950, Director Schottland sent drafts of proposed legislation to California Assemblyman Laughlin E. Waters and California Senator H. E. Dillinger. He advised each that these bills contained changes necessary to meet conformity requirements of the Federal Security Agency, that members of the State Social Welfare Board spent considerable time and effort working out the problems of conformity between the state laws and the requirements of the federal agency, that federal funds were being received on a current basis, and that he had been assured that if the Legislature adopted substantially the legislation contained in the bills he was forwarding, the state would remain in conformity. *Each*

*letter specifically referred to the objection which had been made by the federal Social Security Administration that California law does not take into consideration all income and resources in determining need,* and advised that the attached bill proposed an amendment to section 2164 to require that ''Real property owned but not occupied as a home shall be utilized to provide for the needs of the applicant or recipient.'' Each letter further advised that ''This requirement will reduce the cost of Old Age Security. The extent to which this will reduce the costs cannot be accurately determined since we cannot forecast the number of cases in which the owner will elect *to rent or sell,* and the return that can be expected from such rental or sale.'' (Emphasis added.) Other amendments proposed by the State Department of Social Welfare were to sections 2163, 2163.2, 2163.6, 2165a, and 2165d of the California Welfare and Institutions Code.[8] Each related to the property or income resources of an applicant or recipient for old-age assistance. Each was approved by the federal authorities. Each was adopted by the California Legislature.

The proposed amendment to section 2164 was embodied in Assembly Bill Number 36, and its companion bill, Senate Bill 29. It was passed without a dissenting vote at an extraordinary session of the Legislature which had been called by the Governor of California ''to consider and act upon legislation relating to the protection and care of, and assistance to, children, needy persons, and other specially in the need thereof.'' (Cal. Stats. 1950, p. 423.)

On April 14, 1950, Director Schottland wrote to the then Governor of California, the Honorable Earl Warren, requesting his approval of the bill and informing him that it was ''designed to meet conformity questions raised by the Social Security Administration relative to real property owned but not occupied as a home by applicants or recipients of Old Age Security. The intention of the federal authorities is that such property *shall be utilized* to meet the needs of such persons. This proposal will not immediately disqualify any applicants or recipients since the federal agency advises us that an actual attempt *to rent or sell* such properties will meet with our requirements.'' (Emphasis added.) The governor signed the bill and it went into effect on July 15, 1950.

Prior to the effective date of this amendment the State De-

---

[8]See Preliminary Report of Senate Interim Committee, and Analysis of Legislature by Interim Committee on Social Welfare, Appendix to Journal of Senate, Regular Session, etc. of California, *supra,* pp. 5, 14; also 15 Ops. Cal. Atty. Gen. 57 [Jan. 28, 1950].

partment of Social Welfare issued Bulletin 404A, amending Bulletin 404, to provide that ''For the purpose of this section it shall be considered that the market value of real property other than the home is double the county assessed value. Encumbrances of record shall be deducted from the market value to determine net value.'' Subsequent to the enactment of the amendment to section 2164 of the Welfare and Institutions Code, Bulletins 404 and 404A were superseded by Bulletin 425. It is from this bulletin that Regulations A-133.10 and A-133.40 of the State Social Welfare Board, here involved, are derived. This bulletin provided in part under the caption ''C. Enforcement of Utilization Requirement'' as follows: ''. . . 2. Utilization of real property shall not be considered feasible under the following circumstances: a. The recipient knows of no way whereby he could make the property contribute toward his current needs and the county determines that any effort on his part toward utilization would be futile. The recipient, in order to qualify for continuing aid, shall offer the property for immediate sale unless sale of the property would be a useless act.''

In its Biennial Report to the governor, for the years 1948-1950, at page 15, the State Department of Social Welfare advised that by rules and regulations of the state Social Welfare Board the express policy of the state Legislature had been given effect prior to the effective date of the enactment of section 2164. In its Biennial Report for 1950-1952, at page 24, the department again reported on its administration of the utilization requirements of section 2164, which required a sale or a bona fide effort to make a sale where property cannot otherwise be utilized unless its actual value is such that the proceeds on a sale would not cause the recipient's personal property to exceed the $1,200 statutory exemption.

*Since the 1950 amendment, bills have twice been introduced in the Legislature to amend section 2164 to provide that property not utilized need not be sold.*[9] *None of these amendments was adopted.* ▮▮▮▮ The refusal of the Legislature to change the language of this statute here in question, in view of the knowledge it clearly had as to the administrative interpretation of this section by the State Board of Public Welfare and the requirements of the federal Social Security Act and of the federal Social Security Administration, clearly refutes any

[9]1957 Session: S.B. 461: to add to section 2164 ''nor need such property be sold.''

1959 Session: S.B. 896 and A.B. 1837: to add ''sale shall not be considered a form of utilization.''

implication that the Legislature did not knowingly enact and has knowingly retained the "utilization" provisions of section 2164 intending that a sale might be required thereunder.

 This court can take judicial notice of the records of the California Department of Social Welfare and of the California Board of Social Welfare, and also of the official acts and regulations of a department of the United States. (Code Civ. Proc., § 1875, subd. 3; *Parker* v. *James Granger, Inc.,* 4 Cal.2d 668, 677 [52 P.2d 226].) The continuous, consistent administrative interpretation of this section is of great persuasive force, particularly in view of the provisions of the federal and state acts above referred to. (*City of Los Angeles* v. *Rancho Homes, Inc.,* 40 Cal.2d 764, 770-771 [256 P.2d 305].)

Pertinent also to the determination of the issues before us, is the provision of section 4 of title I of the federal Social Security Act (42 U.S.C. § 304). This provides that "In the case of any State plan for old-age assistance which has been approved by the Secretary of Health, Education, and Welfare, if the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of such plan finds—— . . . (2) that in the administration of the plan there is a failure to comply substantially with any provision required by section 302 (a) of this title to be included in the plan; the Secretary of Health, Education, and Welfare shall notify such State agency that further payments will not be made to the State until the Secretary is satisfied that such prohibited requirement is no longer so imposed, and that there is no longer any such failure to comply. Until he is so satisfied he shall make no further certification to the Secretary of the Treasury with respect to such State." Identical provisions refer to state plans for the needy blind (42 U.S.C. § 1204), for dependent children (42 U.S.C. § 604), and for the totally disabled (42 U.S.C. § 1354).

On January 8, 1960, J. M. Wedemeyer, the present Director of the State Department of Social Welfare, received a communication from Mrs. Azile H. Aaron, as an authorized representative of the federal Public Assistance Bureau of the Department of Health, Education and Welfare, with reference to the decisions of the California trial court in this proceeding and of the California District Court of Appeal, Fourth District, in *Macomber* v. *State Social Welfare Board, supra,* 175 Cal.App.2d 614, "invalidating regulations of the State Social Welfare Board with the result that an applicant or recipient of old age assistance may not be denied aid even though, be-

cause of ownership of valuable resources in the form of unimproved real property, he is not in fact a needy individual.''
The letter further states:

''The old age assistance plan of California was approved for federal financial participation on February 17, 1950, by the Commissioner of Social Security *only* upon the basis of assurances then given the Commissioner by the State that certain legislation would be enacted to meet the requirements of the federal law that assistance be confined to needy individuals and that all other income and resources of the individual claiming assistance be taken into consideration in determining his need. Among them was an assurance pertaining to the federal requirement that real property which is not utilized as a home must either produce income to meet the current needs of the individual or be considered as part of the property reserve to meet future identifiable needs comprised of all other property holdings, both real and personal, the maximum actual value of which may not exceed $1500.00 [Italics by Mrs. Aaron.]

''Pursuant to these assurances, Chapter 26, California Statutes 1950 First Extraordinary Session, was enacted amending Section 2164 of the Welfare and Institutions Code to add the requirement that: 'Real property owned but not occupied as a home by an applicant or recipient shall be utilized to provide for the needs of the applicant or recipient.'

''We accepted this legislation as fulfilling in this respect the assurances given regarding the California old age assistance plan and we did so upon the premise that it authorized your department to provide by appropriate regulations that real property which cannot otherwise be utilized to meet the needs of the individual would be converted into liquid assets to meet such needs if he is to qualify for old age assistance. *The regulations adopted by your department under Section 2164 as thus amended were accordingly approved as part of the plan.* [Emphasis added.]

''Upon a review of the court decisions mentioned above invalidating these regulations it appears to us that the State may be disabled from any longer fulfilling in this respect the assurances which were given to meet this federal requirement for the granting of funds to the State. Since the question thus raised may operate to jeopardize the continued receipt of federal funds by the State for financing the old age assistance program, we felt that you should be notified of this serious possibility so that you may, if you deem it advisable, discuss

the matter with the Governor and take such other steps as appear appropriate.''

An official communication confirming this advice, was received by State Director Wedemeyer from W. L. Mitchell, as Commissioner of Social Security, under the authority and responsibility vested in the Secretary of Health, Education and Welfare to administer Title I of the Social Security Act, and delegated to Mr. Mitchell as Commissioner of Social Security. (§§ 4 and 6, Reorganization Plan No. 1 of 1953, 18 Fed. Reg. 2053, 67 Stat. 631; Dept. of Health, Education, and Welfare Statement of Organization and Delegation of Authority, § 8.20, 22 Fed. Reg. 1050, as amended by 24 Fed. Reg. 6657, 9373; U.S. Government Organization Manual [1959-1960], 342.) This letter advised that the federal Department of Health, Education and Welfare, Social Security Administration concurred in the contents of the letter of Mrs. Azile H. Aaron to California Director Wedemeyer of January 8, 1960, and added that ''We assure you that under her authority and responsibility as a representative of the Social Security Administration, Mrs. Aaron had no choice but to advise your Department promptly regarding any developments which might bring into question the conformity of your State program with requirements of the Social Security Act. Under the circumstances, it was appropriate for her to explain the possible fiscal results connected with the issue. . . . As indicated therein, in the event of abrogation of the State regulations in question, the [federal] Bureau of Public Assistance must determine whether the State program continues to take into consideration income and resources of persons receiving assistance and is serving people on a needs basis.''

In passing upon the validity of the regulations of the State Board of Social Welfare as measured by the provisions of section 2164 of the California Welfare and Institutions Code, this court may well take cognizance of the consequences of their invalidation. (*People* v. *Knowles, supra,* 35 Cal.2d 175, 182.) As stated in the California State Department of Social Welfare Biennial Report, 1938-1940, p. 16, ''The public assistance programs which are under the supervision of the . . . [State Board of Social Welfare] comprise aid to the needy aged, blind and children. In each instance, Federal, State, and county governments cooperate. The State law provides for the sharing of costs between the State and the counties; and the Federal Government, under the Social Security Act, participates in the three programs. The method

of operation is one of county administration and State supervision. . . ." California law does not make the payment of old-age assistance contingent on federal grants, but should federal support be withdrawn, as by the disapproval of the California plan, the burden of the program and its administration would have to be borne entirely by the taxpayers of the state of California and its counties (Welf. & Inst. Code, § 2021). In the fiscal year 1958-1959 the state and counties of California paid out $247,814,083 for old age security, of which $119,118,887 or 48.2 per cent was contributed by the United States. During the current fiscal year disbursements for old age security have averaged more than $21,000,000 monthly, of which the United States has contributed between $9,500,000 and $10,100,000 per month. In addition the federal government contributes more than $9,400,000 per year for the cost of administration of the program in California. (See State Dept. Social Welfare, Public Welfare Statistical Series, monthly and annual pamphlets from 1958 to January 1960; annual or biennial reports of the department; Annual Statistical Summary 1958-1959, p. 44, Payments for Assistance and Administration from State and Federal Funds, by Program.)

▉ Discontinuance of federal aid would affect eligibility requirements for recipients of state aid. Section 2160, subdivision (c) (2) of the California Welfare and Institutions Code provides lowered residence requirements only during the time that grants-in-aid are provided by the United States government and accepted by this state for old-age assistance. Should the state plan be no longer acceptable to the federal government and federal funds not available, the provisions of subdivision (c) (1) of section 2160 would become effective, with the requirement of 15 years continuous residence. At the end of January 1960 some 257,931 persons were receiving old age security in California. If federal participation were to be discontinued and the residence requirements changed, an estimated 50,000 individuals might immediately cease to be eligible.

Also affected by the determination of the issues before us would be the California plan for other public assistance or "categorical aid programs" administered by it with the aid of federal grants. The net loss to the state could run as high as $216,000,000 a year on the basis of the figures for the fiscal year 1958-1959. (See State Department of Social Welfare Annual Statistical Summary, 1958-1959, *supra*, p. 44.)

▉ The public purpose expressed by both the federal

Social Security Act and the California Old Age Security Law (see Welf. & Inst. Code, § 2000), and California statutes for Aid to Needy Blind, Aid to Needy Children and Aid to Needy Disabled, is to render public assistance to people *in need*. The California acts were adopted or amended for the purpose of operating in harmony with the federal system with a view to obtaining federal assistance in providing such aid to needy persons in these categories. (*Newbold* v. *Social Welfare Board, supra,* 76 Cal.App.2d 844, 847.) Not only does the legislative history of this act confirm this conclusion but the California Constitution, article XXVII, and the California Welfare and Institutions Code provide for such cooperation by the state with the federal program and for the participation by the state in the receipt of federal grants-in-aid for this purpose.

. The United States Supreme Court has described the federal-state cooperation in such programs as "a cooperative legislative effort by state and national governments, for carrying out a public purpose common to both, which neither could fully achieve without the cooperation of the other." (*Carmichael* v. *Southern Coal & Coke Co.,* 301 U.S. 495, 526 [57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327].) The Supreme Court of Montana cogently stated in *State* ex rel. *Dean* v. *Brandjord,* 108 Mont. 447 [92 P.2d 273, 279], as follows: "When the whole subject of relief for the aged indigent is taken into consideration, when the history of federal and state legislation is given proper effect, when the national plan and the subsequently enacted state plans of the different states are understood, it would seem that none of the state plans, including our own, were ever devised to stand or operate, without the cooperation of the federal government. . . . If this be true, and we think that it is beyond question the outstanding theory of the whole matter, *then it is obvious that our law must be construed, not as an independent Act, but in conjunction with the federal Act, that is, the two Acts must be administered together as a unified code of laws enacted by Congress and the state legislature for the complete and comprehensive control* of the subject." (Emphasis added.) (See also *Morgan* v. *Department of Social Security,* 14 Wn.2d 156 [127 P.2d 686, 694] ; *Northwestern Mut. Life Ins. Co.* v. *Tone,* 125 Conn. 183 [4 A.2d 640, 121 A.L.R. 993] ; *City of Worcester* v. *Quinn,* 304 Mass. 276 [23 N.E.2d 463, 125 A.L.R. 707].)

▇▇▇▇ Such cooperative legislation is not a relinquishment of state sovereignty. Even sovereigns may contract without

derogating from their sovereignty. (*Steward Machine Co.* v. *Davis*, 301 U.S. 548, 597 [57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293].)

The state assistance programs involve federal subsidies and they are subject to reasonable federal regulations. (*Cf. Ivanhoe Irr. Dist.* v. *All Persons*, 53 Cal.2d 692, 713-714 [3 Cal.Rptr. 317, 350 P.2d 69]; *County of Marin* v. *Superior Court*, 53 Cal.2d 633, 640-641 [2 Cal.Rptr. 758, 349 P.2d 526].) Under both the federal and state acts administrative boards are empowered to promulgate rules, regulations and administrative interpretations. These regulations should be harmonized wherever possible, within the statutory limits established, in order to carry out the cooperative public purpose and law of both sovereigns.

The federal administration has established what it terms a "rule of reason" as to the purposes for which real and personal property may be retained by recipients under federally-approved state plans and as to the amounts which may be held by such recipients. (See Dept. of Health, Education and Welfare, Handbook of Public Assistance Administration [Supplement for Administrative Use], Paragraph S-3120, issued March 24, 1955.) Under this rule a state may, without danger of nonconformity with the federal act, allow a recipient to retain his home, regardless of its value; he may be allowed to retain income producing real or personal property regardless of value, but the income must be considered in fixing need; and a maximum limit of $1,500 is established for reserves, including idle real property. Where states have proposed specific amounts in excess of this $1,500 limit, the federal administration has taken the position that such amounts are "unreasonable."

Both the federal act and the California act require that all income and resources of an applicant or recipient must be taken into account in determining whether an aged individual is *needy*. California law provides that a recipient may not retain his eligibility if his real property, including his home has a net assessed value of more than $5,000, and that real property not used as a home must be utilized to meet the needs of the applicant or recipient. Real property which is used as a home is considered to be utilized for that purpose. The $1,500 limitation set by the federal Social Security Administration appears to be a reasonable one under the purposes and provisions of the federal act and it is not repugnant to any of the provisions of the state act. Compliance with such

requirement by the state administrative body appears to be proper and to be in accord with California law.

Regulations A-133.10 and A-133.40 of the California State Social Welfare Board are also reasonable. They are valid, not only as a proper compliance with the requirements of the federal Social Security Act and the rules of the federal Social Security Administration, but they are germane to the spirit and letter of California law. The application of these regulations to the respondents was proper and the determination of the State Social Welfare Board that the Pearsons' payments should be discontinued as of August 31, 1957, should be upheld.

There is no merit to the further contention raised by the respondents that Regulations A-133.10 and A-133.40 violate the equal protection of law clauses of the federal and state Constitutions. It is their contention that under these rules a recipient who owns a home assessed at $5,000 may remain eligible, while one who owns real property not used as a home must sell it or lose his eligibility although it may be assessed at much less than $5,000. Under the regulations of the state board, however, the income value of real property used as a home must be taken into consideration in determining the needs of a recipient for old-age assistance. (See also Regulation A-212.9 of the State Social Welfare Board.) State law declares the ineligibility of a person who owns any real property assessed at more than $5,000 county assessed value. It is not necessary to here decide whether home owners may be granted different rights than nonhome owners as this is not in issue before us.

The decision of the District Court of Appeal in *Macomber* v. *State Social Welfare Board, supra,* 76 Cal.App.2d 844, is hereby disapproved, as are the unreported decisions in *Trujillo* v. *State Social Welfare Board, supra,* Los Angeles County No. 654454, and *Putnam* v. *State Social Welfare Board, supra,* San Diego County No. 223084.

Implications in the following cases that a recipient may not under any circumstances be disqualified who owns property assessed at less than the statutory maximum stated in section 2164, are not correct statements of the law as it now exists: *Bila* v. *Young* (1942), 20 Cal.2d 865, 869 [129 P.2d 364] ; *County of Los Angeles* v. *La Fuente* (1942), 20 Cal.2d 870, 875 [129 P.2d 378] ; *Board of Social Welfare* v. *County of Los Angeles* (1945), 27 Cal.2d 90, 96 [162 P.2d 635] ; *County of San Bernardino* v. *Simmons* (1956), 46 Cal. 2d 394, 400 [296 P.2d 329].

The judgment is reversed and the cause remanded with directions to the court below to enter judgment for defendant State Social Welfare Board.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Dooling, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.