[Civ. No. 58740. Second Dist., Div. One. Dec. 19, 1980.]

CALIFORNIA COASTAL COMMISSION,
Plaintiff and Appellant, v.
QUANTA INVESTMENT CORPORATION,
Defendant and Respondent;
RICHARD P. HAUSMAN et al., Interveners and Respondents.

584

COUNSEL

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Steven H. Kaufmann, Deputy Attorney General, for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Fulop, Rolston, Burns & McKittrick, Marvin G. Burns, K. Phillip Knierim, Edmund S. Schaffer, Boren, Elperin, Howard & Sloan, William Elperin, Tamila C. Jensen and Roger H. Howard for Interveners and Respondents.

OPINION

**AUERBACH, J.\***—The California Coastal Commission (Commission) appeals from an order denying its application for a preliminary injunction to restrain certain stock cooperative conversions from being accomplished in the coastal zone without permits from the Commission. The question to be resolved is whether the conversion of such existing apartment units into a stock cooperative form of ownership constitutes a "development" which falls within the permit jurisdiction of the various Coastal Commissions under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.).

*Procedural History*

On April 6, 1979, the Commission filed a complaint seeking to enjoin defendant Quanta Investment Corporation (Quanta) from converting its existing 100-unit apartment building situated in the coastal zone area, into a stock cooperative. The complaint alleged that Quanta had applied to the Department of Real Estate for a public report on the contemplated conversion and that, unless restrained by the court, would

---

*Assigned by the Chairperson of the Judicial Council.

proceed with the conversion without first seeking or obtaining a coastal development permit, in violation of the act.[1]

On April 19, 1979, the Department of Real Estate informed the Commission that issuance of a public report to Quanta was imminent, and that without a court order restraining the conversion, it would be obliged to issue the report.[2] One day later, the Commission applied for and obtained a temporary restraining order preventing Quanta "from receiving, using or acting upon the final public subdivision report applied for" to the Department of Real Estate pending a hearing on a preliminary injunction.

On June 7, 1979, interveners Hausman and Por La Mar Circle, Inc., each proposing to convert their respective existing apartment buildings into stock cooperatives, were granted leave to intervene on behalf of defendant Quanta.[3] On July 2, 1979, the City of Redondo Beach was granted leave to file an amicus brief on behalf of the Commission. On July 18, 1979, the superior court denied the Commission a preliminary injunction.

Following the appeal from the last mentioned order, this court denied the Commission's petition for writ of supersedeas to stay the order denying the preliminary injunction and to stay the completion of any stock cooperative conversion pending the resolution of this appeal. The Commission's petition for hearing after denial of the writ of supersedeas was denied by the California Supreme Court.[4]

---

[1]We take judicial notice that at approximately the same time, the Commission filed about 30 similar lawsuits against other developers who were also seeking public reports for proposed stock cooperative conversions in the coastal zone without applications for coastal permits.

[2]Under the provisions of the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.), the Department of Real Estate is charged with issuing public reports for stock cooperative offerings before public sales of such shares can be made.

[3]Quanta was subsequently dismissed from the lawsuit when it moved its proposed conversion outside the coastal zone.

[4]We take judicial notice that since the appeal herein was filed, additional interveners proposing stock cooperative conversions were granted leave to intervene in the action. Additionally, two lis pendens placed by the Commission on the real property of two of the interveners were ordered expunged by the trial court. This court confirmed the trial court's ruling (*California Coastal Com. v. Superior Court* (Cal.App., L.A. 31271), and denied a petition for rehearing. A hearing was granted by the Supreme Court on May 29, 1980.

## Statutory Background

It will be of assistance in focusing on the issue posed to adumbrate the interweaving of the Coastal Act and the two subdivision acts as they ultimately impinge on the disputed conversion.

### A. The Coastal Land Use Plan

The inestimable value of the California coast as a social, economic and recreational resource of the citizens of this state and their great concern to prevent its environmental degeneration is too well known to require extended documentation. This grass roots interest was mobilized into the upsurge and crescendo of a strong, popular movement, culminating in 1972 with the passage through the initiative process of Proposition 20, which enacted the California Coastal Zone Conservation Act. That law (former Pub. Resources Code, §§ 27300-27320) imposed upon the newly created California Coastal Conservation Commission, and its six regional commissions, the task of preparing a California coastal plan, to be submitted by 1976 to the Legislature, together with recommendations for the long-term governance of land use and other facilities in the littoral. In the interim, development in the coastal zone area was controlled by the Commission through a system of permits.

Pursuant to its mandate, a coastal planning and management program was submitted by the Commission to the Legislature in 1976 and when the political process was completed, the 1976 California Coastal Act was adopted (Pub. Resources Code, §§ 30000-30900). The new legislation perpetuated the California Coastal Commission and six regional commissions (Pub. Resources Code, § 30300) and provided for extensive coordination of the Commission's activities with over a dozen other state agencies to avoid conflicts (Pub. Resources Code, §§ 30400-30418). A great amount of planning and management authority, within the standards and criteria set by the act, was delegated to the various local government units lying in whole or in part, within the coastal zone. (See Pub. Resources Code, §§ 30410-30418; §§ 30103, subd. (a), 30108.4 and 30108.5; §§ 30105 and 30118.) (See also Pub. Resources Code, § 30519, subd. (a).) Provision was made for city and county land use plans submitted to the Commission to be certified for implementation. (Pub. Resources Code, §§ 30511-30513.)

The coastal legislative program was reinforced by the cardinal requirement that, in addition to obtaining any other permit requirement

by law from any local government or from any state, regional, or local agency "... any person wishing to perform or undertake any development in the coastal zone, other than a facility subject to the provisions of Section 25500, shall obtain a coastal development permit." (Pub. Resources Code, § 30600, subd. (a).) Section 30106 defines a development, in part, as follows: "'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, *subdivision* pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, . . ."[5] (Italics added.)

One of the significant purposes of the Coastal Act was to foster the goal of low-income housing availability. This end is reflected in Public Resources Code section 30213, which provides, as amended since 1976, that housing opportunities in the coastal zone for persons and families of low or moderate incomes should be protected, encouraged "and, where feasible, provided."

B. *Regulation of Real Property Subdivision and Regulation of Individual Parcels of Real Property.*

■ To avoid confusion, it is essential to bear in mind that the subdivision of real property and the sale of subdivided lands involve two separate statutes. The former is regulated by the "Subdivision Map Act" (Gov. Code, §§ 66410-66499.37) and vests in the local governmental body in which the land is located the power to regulate and control the design and physical improvement of a subdivision, to require

---

[5] Section 27103, the predecessor to section 30106 in the 1972 act, read in almost identical fashion, except that after the italicized word "subdivision," appeared the words "of land" and there was no reference to the words "commencing with Section 66410 of the Government Code."

The remainder of section 30106 reads as follows: "... except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511). [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line."

proper consideration of their relation to adjoining areas, and to adopt enabling statutes. (*Kelber* v. *City of Upland* (1957) 155 Cal.App.2d 631 [318 P.2d 561]; *City of Buena Park* v. *Boyar* (1960) 186 Cal.App. 2d 61 [8 Cal.Rptr. 674].) It provides for the creation of accurate maps showing the interior and exterior boundaries of subdivisions and the location of improvements. (Former Bus. & Prof. Code, §§ 11550 and 11619, now Gov. Code, §§ 66452 and 66413 respectively.)

The Subdivided Lands Act is found in the Real Estate Law, which is administered by the Real Estate Commissioner. (Bus. & Prof. Code, § 11000 et seq.; Cal. Admin. Code, tit. 10, § 2790 et seq.) Since at least 1965, the Real Estate Commissioner has had authority over planned developments, community apartment projects, condominiums and stock cooperatives. (See Bus. & Prof. Code, §§ 11000, 11004.5.) The purpose of the Real Estate Law is to prevent fraud and misrepresentation in the marketing of parcels of land by requiring disclosure of the financial risks and benefits of a transaction to proposed purchasers and lessees. (*Westbrook* v. *Summerfield, Roberts etc., Inc.* (1957) 154 Cal.App.2d 761 [316 P.2d 691]; *Handleland* v. *Department of Real Estate* (1976) 58 Cal.App.3d 513 [129 Cal.Rptr. 810].) To accomplish this, the Real Estate Commissioner issues public reports based on extensive disclosures made by the subdividers in connection with the parcels they offer for sale or lease. (Bus. & Prof. Code, §§ 11010-11018.1.) A sale or lease without providing a public report to the transferee is prohibited. (Bus. & Prof. Code, § 11018.2.)

The applicable statutes in their present forms and their statutory placement evolved, in part, against the background of the fulfillment of the American dream of home ownership since the end of World War II, as a replacement for occupancy in the traditional rental unit in a multifamily dwelling. (Friedman & Herbert, *Community Apartments: Condominium or Stock Cooperative?* (1962) 50 Cal.L.Rev. 299, 300.) The satisfaction of such an aspiration for an expanding urban population in high density areas with scarce housing and concern for land conservation, took the form of community ownership. (*Ibid.*, p. 300; Wenig & Schultz, *Government Regulation of Condominiums in California* (1963) 14 Hastings L.J. 222.) Probably the earliest and originally the most popular of communal living arrangements was the stock cooperative. (*Estate of Pitts* (1933) 218 Cal. 184 [22 P.2d 694]; Friedman & Herbert, *supra,* 50 Cal.L.Rev. 299.) Thereafter, the California boom in "home ownership"—sans house in the time-honored sense—produced a variant, the community apartment, known also as the "deed plan."

(Barber, *Co-op—The Deed Plan, Community Apartment Project* (1961) 36 State Bar J. 310.) By 1960, attention became focused upon the growth and development of the condominium as the darling of community living. (Wenig & Schultz, *supra*, 14 Hastings L.J. 222.)

Before directing our attention to the appearance of these concepts of ownership in the subdivided lands law and in part in the Subdivided Map Act, a brief description of each category is helpful. Miller and Starr, 4 California Real Estate, section 24:5, page 9, defines them as follows: "A 'stock cooperative' is a corporation formed to hold the title to real property where the shareholders have a right of exclusive occupancy of a portion of the property and the right to transfer occupancy can only be made concurrently with the transfer of the stock. The stock cooperative is regulated by the law if it has two or more shareholders. The stock cooperative is also subject to the jurisdiction of the Commissioner of Corporations. [¶] A 'community apartment project' is any apartment house where an undivided interest in the title to the real property (such as a tenancy in common) is coupled with the right of exclusive occupancy of a separate apartment unit. The sale of an interest in such a project is regulated by the law if it contains two or more apartments. [¶] A 'condominium' is an undivided interest in common to a portion of a parcel of land together with a separate interest in space contained in a portion of the building, and, possibly, in part of the land. A sale of a condominium unit is under the jurisdiction of the real estate law if the project contains two or more condominium units." (Fns. omitted.)

Since the question posed is whether the conversion of an existing apartment into a stock cooperative, although nowhere mentioned therein, is regulated by the Subdivision Map Act, and hence constitutes a "development" under Public Resources Code section 30106, we are constrained to consider the legislative process and circumstance by which each form of ownership interests mentioned received statutory recognition and treatment.

In 1943, the Legislature codified earlier statutes regulating various aspects of "subdivisions" into two separate acts. The Subdivision Map Act was enacted as sections 11500-11641 of the Business and Professions Code and the Subdivided Lands Act was enacted as Business and Professions Code sections 11000-11200. From the outset, the Legislature dealt with each act as a separate entity, treating certain matters in an identical fashion and giving diverse treatment to others. As initially

passed, the term "subdivision" was separately defined for purposes of each act. In the Subdivision Map Act, "subdivision" was defined as: "...any land or portion thereof, shown on the last preceding tax roll as a unit or a contiguous unit, which is divided for the purpose of sale, whether immediate or future, by any subdivider into five or more parcels within any one year." (Former Bus. & Prof. Code, § 11535, Stats. 1943, ch. 128, § 1, p. 867.)

For purposes of the Subdivided Lands Act, "subdivision" was defined as: "...land or lands divided or proposed to be divided for purposes of sale or lease, whether immediate or future, into five or more lots or parcels." (Former Bus. & Prof. Code, § 11000, Stats. 1943, ch. 127, § 1, p. 962.)

The sections of the Subdivision Map Act and the Subdivided Lands Act in which these definitions are given each contained language stating that nothing therein shall in any way modify or affect any of the provisions relating to subdivisions in the separate acts. (Bus. & Prof. Code, §§ 11000,[6] 11535, subd. (e).) The Subdivision Map Act further provided in Business and Professions Code section 11501 that its definitions apply to the provisions of that act only and do not affect any other provisions of the Business and Professions Code.[7]

In 1951, an Attorney General opinion concluded that community apartment projects constitute a subdivision within the meaning of the Subdivided Lands Act. (17 Ops. Cal.Atty.Gen. 79, 82 (1951).) In 1955, section 11000 of the Subdivided Lands Act was amended to include community apartment projects within the act's coverage and section 11004 of the Business and Professions Code was added to define a community apartment.[8] This same legislation seems to have made community apartments subject also to the Subdivision Map Act.[9]

In companion legislation enacted that same year, both the Subdivision Map Act in Business and Professions Code section 11535,

---

[6]The current reference in section 11000 is to section 66424 of the Government Code.

[7]The equivalent now appeared in section 66414 of the Government Code.

[8]Statutes, 1955, chapter 1013, sections 1 and 2.

[9]This appears to be so because the legislation cited in footnote 8 made community apartments subject to the "provisions of this part," a part which at that time included both the Subdivided Lands Act and the Subdivision Map Act. Any doubt was removed in 1963 when the Legislature added a new section—11535.1—to the Business and Professions Code, stating that "[f]or purposes of Section 11535, [containing the Map Act's basic definition of a subdivision] 'subdivision' includes...a community apartment project, as defined in [Subdivided Lands Act] Section 11004,..." (Stats. 1963, ch. 860, § 4.)

subdivision (a) and the Subdivided Lands Act in section 11000 thereof were amended to add an identical proviso, namely that "this chapter shall not apply to the leasing of apartments, offices, stores, or similar space within an apartment building,..." (Stats. 1955, ch. 1013, § 3.)

In 1963, the Subdivision Map Act was amended by adding Business and Professions Code section 11535.5 (see fn. 9, *ante*), which included, as a subdivision under the map act "...a condominium project... containing five or more condominiums and a community apartment project...containing five or more parcels." It may be noteworthy that the Legislature did not change the exclusion of apartment leasing in section 11535, subdivision (a) of the Subdivision Map Act.

In 1965, the Legislature enacted a definition of stock cooperatives to the Subdivided Lands Act, in section 11003.2 to the Business and Professions Code. (Stats. 1965, ch. 988, § 2.5.)[10] In the same legislation, the Subdivided Lands Acts was extended to cover stock cooperatives by adding section 11004.5 of the Business and Professions Code, which reads, as here applicable: "In addition to any provisions of Section 11000...the reference therein to 'subdivided lands' and 'subdivision' shall include all of the following:

"· · · · · · · · · · · · · ·

"(d) Any stock cooperative as defined in Section 11003.2 of this code, including any legal or beneficial interests therein, having or intended to have two or more shareholders." (Stats. 1965, ch. 988, § 3.)

In 1974, the entire map act was transferred to the Government Code, where it is codified in sections 66410-66499.37. The map act's definition of "subdivision" was transferred without change, but it was recodified in Government Code section 66424, which states in pertinent part: "'Subdivision' means the division, by any subdivider, of any unit or units of improved or unimproved land,...for the purpose of sale, lease or financing,...'Subdivision' includes, a condominium project, ...a community apartment project,..." As a part of the recodification, Government Code section 66412, subdivision (a), provides in part that

---

[10]Statutes 1965, chapter 988, section 2.5 provides: "A 'stock cooperative' is a corporation which is formed or availed of primarily for the purpose of holding title to, either in fee simple or for a term of years, improved real property, if all or substantially all of the shareholders of such corporation receive a right of exclusive occupancy in a portion of the real property, title to which is held by the corporation, which right of occupancy is transferable only concurrently with the transfer of the share or shares of stock in the corporation held by the person having such right of occupancy."

the Subdivision Map Act "...shall be inapplicable to: [¶] (a) The financing or leasing of apartments, offices, stores or similar space within apartment buildings,..."

In connection with this recodification, former section 11501 of the Business and Professions Code, which had provided that the definitions in the map act did not affect any other provision of that code while both the map act and the Subdivided Lands Act were part of the Business and Professions Code was now transferred to section 66414 of the Government Code and its language changed slightly so as to read: "The definitions in this article [the Map Act] apply to the provisions of this division [the Map Act] only and do not affect any other provisions of law." (Stats. 1974, ch. 1536, § 4.) This formulation appears to be in keeping with the studied purpose of the Legislature since at least 1943 to keep separate the map act and the Subdivided Lands Act, just as when both were part of the same code. A finer point was put on these separate classifications a year later when section 11000 of the Subdivided Lands Act was amended in its basic definition of "subdivision" to omit a reference to former section 11535 of the map act and to replace it with: "Nothing in this section shall in any way modify or affect any of the provisions of section 66424 of the Government Code." (Stats. 1975, ch. 24, § 3.)

When the California Coastal Zone Conservation Act of 1972 was adopted, section 27103 of the Public Resources Code, in defining a coastal zone "development" relating to a "subdivision," referred specifically to the map act and not to the Subdivided Lands Act. Upon enactment in 1976 of the present Coastal Act, Public Resources Code section 27103 became section 30106 and the reference to "subdivision" as a "development" alluded specifically to the map act as recodified in Government Code section 66410 et seq., and once again omitted any reference to the Subdivided Lands Act. Prior to the reenactment of the Coastal Act in 1976, the Commission had never exercised permit jurisdiction over conversions of existing apartments into stock cooperatives, although it was fully aware of such occurrences in the coastal zone. Melvin J. Carpenter, the executive director of the South Coast Regional Coastal Commission, inquired of the Attorney General as to whether such conversions came under the jurisdiction of the Coastal Commission. On July 21, 1976, the Attorney General issued his opinion to Mr. Carpenter in indexed letter SO 76/43 IL,[11] which, after analysis, con-

[11]An indexed letter is different from a formal opinion of the Attorney General, which is widely disseminated throughout the state and is ultimately published in bound vol-

cluded that the conversion of an existing apartment building to a stock cooperative form of ownership does not come under the permit jurisdiction of the Coastal Commission.[12] The opinion reasoned that a stock cooperative conversion was not a subdivision pursuant to the Subdivision Map Act, nor did it constitute "any other division of land"[13] within the meaning of the definition of "development" in the California Coastal Act. So far as the evidence shows, this indexed opinion was not brought to the attention of the Legislature before August 12, 1976—the last date for amendments to the 1976 Coastal Act. ▋ Absent such knowledge, a legislative intent to exclude stock cooperatives from the purview of the subsequently passed Coastal Act cannot be presumed. (*Pacific Greyhound Lines v. Johnson* (1942) 54 Cal.App.2d 297, 303 [129 P.2d 32].)

In the time remaining after receiving this opinion, the Commission made no effort to have the 1976 bill amended to furnish it with regulatory powers over stock cooperative conversions, and immediately after its passage continued its antecedent practice of abstention from regulation. However, after approximately six years of nonaction, at a meeting of the Commission on October 31, 1978, the Commission took the position that it had permit jurisdiction over stock cooperative conversions under the Coastal Act. It brought the present action for injunctive relief to vindicate its interpretation of Public Resources Code section 30106, namely, that stock cooperative conversions constitute a "development" as described in that section.

On March 23, 1979, Senator Nicholas Petris introduced Senate Bill No. 823, which was an act to amend Government Code section 66424, and six other sections of the Government Code, all relating to subdivisions. The bill went through four drafts, the final one on September 6, 1979, after the trial court made its order denying the Commission's application for a preliminary injunction. This bill was enacted by the Legislature to become effective January 1, 1980, and amends section 66424 of the Government Code to make stock cooperative conversions of five or more dwelling units subject to the provisions of the Subdivision Map Act. Senate Bill No. 823 also contains a "grandfather clause"

umes. Indexed letters are kept in the Attorney General's four libraries and are ordinarily made available to interested members of the public upon request.

[12]At trial, the Attorney General advised the court that he was representing the Commission in this litigation because after review of the opinion letter he was satisfied that its analysis and conclusion was in error.

[13]Although the indexed letter reviewed the 1972 act, this provision was carried over intact in the 1976 Coastal Act.

purporting to exempt certain prior unregulated stock cooperative conversions. The impact of this bill upon the Commission's authority to regulate the conversions at issue in this case will be discussed subsequently in this opinion.

In denying the Commission's application for a preliminary injunction, the trial court's ruling was predicated essentially on three grounds: (1) that a stock cooperative conversion falls within the exemption provided in Government Code section 66412, subdivision (a), making the Subdivision Map Act inapplicable to the financing or leasing of apartments within apartment buildings; (2) from the fact that the stock cooperative was not expressly mentioned in section 66424 of the map act or its predecessor sections, it was not intended to be subject to those requirements; and (3) that a stock cooperative conversion does not constitute what section 30106 of the Public Resources Code denominated as "any other division of land."

### Discussion

### A. A Stock Cooperative Conversion Does Not Constitute a Subdivision Pursuant to the Subdivision Map Act

The Commission's attempt to exercise jurisdiction over stock cooperative conversions may be validated only if it was within the scope of the regulatory authority conferred by the Coastal Act of 1976. (*Blatz Brewing Co.* v. *Collins* (1948) 88 Cal.App.2d 438, 450 [199 P.2d 34]; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687].) Our task therefore is to ascertain whether the conversions at issue constitute a "development" within the meaning of section 30106 of the Public Resources Code, which in part, defines this term as a "change in the density or intensity of use of land,[14] including, but not limited to, subdivision pursuant to the Subdivision Map Act (Commencing with Section 66410 of the Government Code) and any other division of land, including lot splits,..."

At the time of the trial court's ruling, section 66424 of the Subdivision Map Act defined "subdivision," in pertinent part, as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof,...for the purpose of sale, lease or financing,

[14]The Commission, in connection with its application for preliminary injunction, did not press the point that a conversion to stock cooperative ownership occupancy might result in a "change in the density and intensity of use of land," and do not so argue for purposes of this appeal.

whether immediate or future...'subdivision,' includes, a condominium project,...a community apartment project,..."[15] Pursuant to various other Government Code sections, prior to approval of a final map, local governments must make numerous findings with respect to its compliance with the general and specific plans, the housing element, environmental protection, and so forth. (Gov. Code, §§ 66473.5, 66474, 66482.) The Commission concedes, as it must, that section 66424 of the Government Code, as it read at the time of trial, does not expressly include a stock cooperative conversion, although it included community apartments and condominiums. However, the Commission urges that a division of improved land under the Subdivision Map Act results when existing apartments are converted into a stock cooperative, since the residents become shareholders in a corporation which owns the housing project and its common areas, and those shareholder-owners receive exclusive long-term proprietary leases to individual units and the right to use common areas as appurtenant to their ownership interest.

This argument is fallacious for several reasons. First, it ignores that in the many years since condominiums and community apartments were expressly subjected to the Subdivision Map Act, the regulation of stock cooperatives was left to the Real Estate Commissioner under the Subdivided Lands Act. The stock cooperative, which was an entity far older in conception than both the condominium and the community apartment, was put under the Real Estate Commissioner's jurisdiction in 1965, two years after the condominium and the community apartment were specifically mentioned in the map act. It would have been a simple matter for the Legislature to have likewise included the stock cooperative at that time as a part of the map act. Its failure to do so, and the clear distinction that the Legislature consistently made between stock cooperatives and the condominium and community apartments until the advent of Senate Bill No. 823, strongly suggests that the stock cooperatives were deliberately excluded from the coverage of the map act. (*In re Hubbard* (1964) 62 Cal.2d 119 [41 Cal.Rptr. 393, 396 P.2d 809]; *Gilgert v. Stockton Port District* (1936) 7 Cal.2d 384 [60 P.2d 847].) This distinction appears to have been soundly based. ■ There is a crucial difference between stock cooperatives on the one hand, and condominiums and community apartment projects on the other. The occupants of

---

[15]As a consequence of being termed a subdivision under the Subdivision Map Act, all subdivisions creating five or more condominiums or a community apartment project containing five or more parcels required the filing of a tentative and final map. (Gov. Code, § 66426.)

condominiums and community apartments are themselves owners of undivided interests in the land on which they reside; by way of contrast, the shareholder in a stock cooperative is a mere lessee, and stands in a landlord-tenant relationship to the corporation which owns the land. (*Sun Terrace Manor* v. *Municipal Court* (1973) 33 Cal.App.3d 739, 744 [108 Cal.Rptr. 307].) In the *Sun Terrace Manor* case, the court relied upon a Maryland and New York case, and quoted with approval the following language from the New York case, at page 743: "'...[t]he relationship between the [shareholder-tenant] and the [corporate cooperative] is that of landlord and tenant. The fact that the tenant is also a stockholder of the corporation owning and managing the entire premises do not nullify or negate their essential relationship of landlord and tenant in relation to the particular apartment occupied by the [shareholder] (tenant). [T]he identity of the stockholder remains distinct and separate from that of the corporation, and there is no sufficient merger of interest to erase the relationship of landlord and tenant between them. It is elementary that the corporation managing the property and the tenant are distinct and separate entities.'" Based in part upon that reasoning, the court in the *Sun Terrace Manor* case concluded that the holder of a proprietary lease in a cooperative apartment was subject to summary remedy of the unlawful detainer statutes. In rationalizing this result, the court quoted with approval a legal commentator who wrote: "'With one mortgage and one tax bill for the whole [corporative cooperative], a sizeable number of transfers to financially irresponsible people could result in responsible shareholders paying a higher bill.... In a condominium a financially irresponsible person is a nuisance because he does not pay his share of the upkeep. In a cooperative he is a menace whose unreliability may occasion seizure of the whole property by the government for taxes, or by banks for arrears in mortgage payments.'" (*Sun Terrace Manor* v. *Municipal Court, supra*, 33 Cal.App.3d 739, at p. 743.) In similar vein, the court quoted another legal commentator as follows: "'[T]he costs of operating [the apartment] building are paid out of a maintenance fund. In both the stock cooperative and the condominium this fund is maintained by assessment. If a party fails to pay the assessments, his share of the burden is shifted to the other owners or tenants until the default is cured. Therefore, effective enforcement of the covenants to pay the assessments demands that any breach thereof be speedily remedied. [¶] It appears that the stock cooperative is superior in this respect. The lease is generally made conditional upon the occurrence of any of several significant conditions, which usually include breach of any of the covenants that are contained in the typical condominium declaration [Fn. omitted]. If

any enumerated condition does occur the lessor-corporation may exercise the summary remedy available to it [Fn. omitted] upon compliance with a short notice requirement. [Fn. omitted.] The corporation is then free to sell, lease, or rent the premises to another party within a relatively short period of time, [fn. omitted] thereby removing the financial burden imposed on the non-breaching tenant-shareholders.'" (Fn. omitted.) (*Sun Terrace Manor v. Municipal Court, supra*, 33 Cal.App.3d 739, at pp. 743, 744.)

It was perhaps upon this predicate that the former Subdivision Map Act preserved the distinction between condominiums and community apartments, which were expressly subject to the act and the stock cooperative, when it recited that the act shall be inapplicable to "[t]he financing or leasing of apartments, offices, stores or similar space within apartment buildings, . . ." (Gov. Code, § 66412, subd. (a).) The occupant of a condominium or a community apartment, unlike a stock cooperate occupant, is not a lessee, but is himself an owner of certain undivided interests, as well as other separate interests in the property. We agree with the trial court's position that this section shows implicit legislative recognition of the difference between the stock cooperative on the one hand and the condominium and community apartment on the other and elected for the alternative purposes of the map act to exempt the stock cooperative from the impact of that act.[16]

The Commission argues that the stock cooperative form of ownership should not be regarded as constituting "financing or leasing of apartments . . . or similar space within office buildings, . . ." within the meaning of Government Code section 66412, subdivision (a). As authority, it cites Wenig and Schultz, *supra*, 14 Hastings L.J. 222, at page 227, footnote 32, wherein the authors state in part: "The exception in Cal. Bus. & Prof. Code § 11535 [now Gov. Code, § 66412, subd. (a)] for the leasing of apartments in an apartment house would seem to be intended to cover only conventional leases without the other interests which accompany the purchase of a stock cooperative apartment." Other commentators, writing a year earlier, hold a contrary view. We find in Friedman and Herbert, *supra*, 50 Cal. L.Rev. 299, at page 337, the following language: "Since the 'leasing of apartments . . . within an

---

[16]The Commission's citation of *Estate of Pitts supra*, 218 Cal. 184, holding that the interest of an individual apartment owner in a cooperative or corporative community apartment house arrangement was an interest in real property is of no assistance in dealing with the question of whether it is a subdivision under the Subdivision Map Act.

apartment building' is expressly excluded, stock cooperatives are not subject to the provisions of the [California Subdivision Map] act. Condominium projects involving five or more units, being real property divided for purpose of sale, are literally within its scope." (Fn. omitted.) We believe Mr. Friedman expresses the more accurate view. Although Wenig and Schultz, *supra*, 14 Hastings L.J. 222, at page 227, speculate in their article and in the footnote cited that the map act"...seems broad enough to include the interest conveyed to a stock cooperative apartment purchaser," they also concede that as of 1963, the date of their article, "the [Map] Act has never been applied to stock cooperatives." As we have already indicated, we deem this to be so both because of the express legislative exemption which was not nullified until 1979 by Senate Bill No. 823, and because of the studied disparity in the way the Legislature treated the stock cooperative as distinguished from the condominium and community apartment from the very outset.

Although Government Code section 66424 states that a subdivision includes a condominium and a community apartment and it is true the use of the term "include" in a statute is normally a term of enlargement (*Paramount Gen. Hos. Co.* v. *National Medical Enterprises, Inc.* (1974) 42 Cal.App.3d 496, 501 [117 Cal.Rptr. 42]), nevertheless the extended legislative history of making the stock cooperative subject only to the Subdivided Lands Act and omitting it from the map act while the community apartment and the condominium are expressly named in both acts, connotes a conscious legislative limitation of the map act to exclude the stock cooperative from its purview. The overriding principle here applicable is that when a statute omits a specific matter from its coverage, the inclusion of such matter in another statute on a related subject demonstrates an intent to omit the matter from the coverage of the statute in which it is not mentioned. (*Marsh* v. *Edwards Theatres Circuit, Inc.* (1976) 64 Cal.App.3d 881, 891 [134 Cal.Rptr. 844].)

The Commission argues that because the shareholder owner of a stock cooperative has an accretion of homeowner-type benefits which have accrued in recent years, a cooperative conversion is essentially indistinguishable from the community apartment and condominium which are expressly included in section 66424 as examples of subdivisions.[17] These attributes, however, do not compel their exclusion from

---

[17]Among these are (1) an interest in a stock cooperative may be homesteaded (Civ. Code, § 1237); (2) homeowner's exemptions are available to stock cooperative shareowners, and taxes and interest payments are deductible (Rev. & Tax. Code, §§ 218,

the specific exemption afforded by Government Code section 66412, subdivision (a), to the financing or leasing of apartments within apartment buildings. The cooperative project herein involved is owned by a single corporation. The individual units are apartments within an apartment building and are not owned by the residents but are occupied under long-term leases, and fall literally within the exception. Nevertheless, this agglomeration of the attributes of home ownership in the stock cooperative may well have been a motivating consideration in causing the Legislature to enact Senate Bill No. 823 to obliterate future distinctions of treatment between the stock cooperative and the condominium and community apartment. ■ We conclude that the court correctly determined that a stock cooperative conversion was not incorporated within the meaning of "subdivision" in the Subdivision Map Act.

B. *Senate Bill Number 823 Does Not Validate the Stock Cooperative Conversions as Developments Under the Coastal Act.*

After the trial court's ruling, the Legislature enacted Senate Bill No. 823 to be effective January 1, 1980. (Stats. 1979, ch. 1192.) Under Senate Bill No. 823, Government Code section 66424 of the Subdivision Map Act was amended to apply to stock corporations.[18] Accordingly, the pertinent part of that section currently provides: "'Subdivision' means the division, by any subdivider, of any unit...of improved...land,...for the purpose of sale, lease or financing,...'Subdivision', includes, a condominium,...a community apartment project, ...or the conversion of five or more existing dwelling units to a stock cooperative,..."

Section 8 of Senate Bill No. 823 embodies what the parties refer to as a "grandfather clause" which declares the new legislation to be applicable to specified stock cooperative conversions occurring prior to January 1, 1980, but exempting certain others from its operation. The parties are in diametric opposition as to the extent of the "retroactive" application of the bill on the stock cooperative conversions here in issue. A study of the legislative history of section 8 may furnish some enlight-

17264, 17265); (3) purchasers of shares of stock in a cooperative may borrow on the purchase price from both banks and savings and loan associations (Fin. Code, §§ 1236 and 7153.4); and (4) they may build up an equity as monthly payments are made and if the value of the property appreciates.

[18]Senate Bill No. 823 also amends other sections of the Government Code relating to subdivisions under the map act.

ment as to the legislative intent. We, therefore, review the various drafts of that provision.

Senate Bill No. 823 was authored by Senator Nicholas Petris. As originally introduced on March 23, 1979, section 8 squarely declared that "the amendments proposed by...[the Bill] to the Subdivision Map Act, which relate to stock cooperatives, are intended to be declaratory of existing law." On May 4, 1979, section 8 was amended retaining the language purporting to make the bill "declaratory of existing law" but adding the initial version of a grandfather clause in the following language: "Any proceedings which have been completed on or before January 1, 1980, which operated under the assumption that stock cooperatives were not subject to the provisions of the Subdivision Map Act are hereby deemed valid, because the Legislature recognizes that while stock cooperatives are included in the provisions of the Subdivision Map Act,[19] the language of such act is not explicit with respect to including them."

On August 28, 1979, section 8 was again amended. The anterior assertions that the subjection of stock cooperative conversions to regulation under the Subdivision Map Act was "declaratory of existing law" was deleted. Instead, section 8 was rewritten to provide as follows: "Any sales made pursuant to a subdivision public report hereafter issued by the Department of Real Estate for a stock cooperative conversion shall not be deemed invalid under the provisions of this act, if the application for that public report, including payment of an appropriate fee, was made prior to July 1, 1979. [20] [¶] This section shall not apply to stock cooperative conversions which occur in the jurisdiction of governmental agencies which regulated such conversions under the provisions of Subdivision Map Act prior to January 1, 1980. Governmental agency regulation of such conversions under the provisions of the Subdivision Map Act, which was exercised prior January 1, 1980, shall be deemed valid."

We pause here to make two observations. First, the deletion of the flat statement that the bill was declaratory of existing law after two re-iterations of that very assertion, and its nonappearance in the final bill strongly signifies that no legislative concurrence could be obtained for that statement of policy. As stated in *Madrid v. Justice Court* (1975)

---

[19]This is, of course, contrary to the determination we have made in section A, *ante.*

[20]All the interveners presently in this case filed applications with the Department of Real Estate, and paid for their application fees, prior to July 1, 1979.

52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348]: "'The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision.'" Second, the validating language utilized in the last cited amended version of the bill is comprehensive. Had it been adopted, it would have retroactively validated attempts to regulate stock cooperative conversions under the map act by any category of governmental agency without regard as to whether this was done by administrative regulation, by ordinance or otherwise. As pointed out by respondent, by way of example, if a subdivider applied for a public report prior to July 1, 1979, but was in the jurisdiction of any governmental agency that attempted to regulate stock cooperative conversions under the map act prior to January 1, 1980, the regulatory attempt of any such governmental agency would be validated, retroactively, and the benefits of the "grandfather clause" would be lost.

On September 6, 1979, the ultimate version of the bill was presented to the Legislature. The text of the so-called "grandfather clause" in the first paragraph remained unchanged but was now designated as subdivision (a). A revised second paragraph was designated subdivision (b) and reads as follows: "Subdivision (a) of this section shall not apply to stock cooperative conversions which occur in the jurisdiction of governmental agencies which *by legislative action* regulated such conversions under the provisions of the Subdivision Map Act, prior to January 1, 1980. Governmental agency regulation of such conversions under the provisions of the Subdivision Map Act, which was exercised pursuant to *a legislative enactment* prior to January 1, 1980, shall not be invalidated by this section; provided, that no such regulation enacted after July 1, 1979, shall affect a stock cooperative conversion if the application for that conversion's public report, including payment of an appropriate fee, was made prior to July 1, 1979." (Italics added.)

In its rather busy and convoluted way, section 8, in its final form, shows a full legislative retreat from the earlier positions of Senator Petris that the bill making stock cooperatives explicitly subject to the Subdivision Map Act was "declaratory of existing law" and to validate prior regulation of them by any governmental agencies purporting to act under the map act. The new language which has been italicized is far removed from the immediately previous version and expresses its intent to validate some transactions and "grandfather" in others both in affirmative and negative approaches. The final amendment provides (1)

that the only governmental regulation of stock cooperatives deemed valid would be those "...of governmental agencies which *by legislative action* regulated such conversions under the provisions of the Subdivision Map Act...." and (2) that the only governmental agency regulation which would not be invalidated by the bill would be "...regulation of such conversions under the provisions of the Subdivision Map Act, which was exercised pursuant to *a legislative enactment* prior to January 1, 1980,..." and (3) no such regulation by legislative action, which was exercised pursuant to a legislative enactment after July 1, 1979, would affect any stock cooperative conversion as to which an application for a public report was filed with the Department of Real Estate prior to July 1, 1979. We agree with the respondent's view that these limitations exclude a validation of the Commission's attempted regulation in this case for several reasons. First, the Commission does not function by legislative enactments whereas the validation extends only to governmental agencies which regulated "by legislative action" or "pursuant to a legislative enactment." Although it may adopt rules and regulations to make the intent of the Legislature operative, the Commission is an administrative agency which operates pursuant to state law. (Pub. Resources Code, §§ 30330-30342.) However, the Subdivision Map Act which prescribes, for statewide application, the general content and procedures for the preparation and processing of tentative and final subdivision maps by local agencies, expressly delegates to such local agencies the authority to regulate and control by local ordinances subdivision design and improvement and the handling of parcel maps. (See Gov. Code, §§ 66411, 66418-66421, 66424, 66426, 66427-66427.2, 66433, 66444, 66451, 66463.) Second, the Commission has never attempted to regulate stock cooperative conversions under the provisions of the Subdivision Map Act, by requiring tentative or final maps, or making the determinations of fact required for approval or disapproval of a subdivision under that act. (See Gov. Code, § 66424 et seq.) Such regulation as the Commission attempted over the cooperative conversion prior to July 1, 1979, was not done "by legislative action" or "pursuant to a legislative enactment" and therefore cannot be validated by section 8. Senate Bill No. 823 is basically legislation that deals with the gray area of stock cooperative conversions which had posed problems to local authorities around the state charged with implementation of the Subdivision Map Act in their communities, many of them far removed from the coastal zone.[21] The clear import of section 8 is to

---

[21]We are advised by counsel that the following cities were in fact regulating stock cooperatives as a subdivision under the provisions of the Subdivision Map Act: Her-

·validate what otherwise would have been a nugatory attempt at regulation, by validating regulation that had occurred "by legislative action" and "pursuant to a legislative enactment." It does not purport to validate map act regulation by administrative action.

At the instance of the Commission, we grant the request that, in order to resolve any ambiguity as to the legislative interest, this court take judicial notice of the declaration of Senator Petris (Evid. Code, §§ 452, subd. (d), 459).[22] In his declaration, the Senator states: "It was my intent as the author of Senate Bill 823 that Coastal Commission actions with respect to stock cooperative conversions not be invalidated by the provisions of section 8 and specifically that the terms 'governmental agency' or 'governmental agencies' as used in subdivision (b) of section 8 include the Coastal Commission. [¶] As this bill moved through the Legislature, there were a number of concerns expressed about the manner in which Senate Bill 823 would affect stock cooperative conversions in process and local government and Coastal Commission regulation of such conversions. When this bill was heard by the Assembly Ways and Means Committee, I affirmed the fact that it was my intent that subdivision (b) of section 8 applied to the Coastal Commission and that Commission regulation of stock cooperative conversions was not to be invalidated by the provisions of section 8." ▓ It is well recognized that under appropriate circumstances, the individual intent of an author of a bill may provide a reliable index of the collective legislative intent when the language of a statute is susceptible to conflicting interpretations. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371]; *Campbell* v. *Board of Dental Examiners* (1975) 53 Cal.App.3d 283, 286 [125 Cal.Rptr. 694].) A careful examination of the Senator's declaration shows it to be of miniscule probative value. The Senator tells us that his intent was to validate prior Coastal Commission regulation of stock cooperative conversions and that he articulated such an intent before an Assembly Ways and Means hearing. However, he fails to state at what point in the progress of the bill he expressed such intent. The record shows that the bill was before that committee at least three times and was twice amended. The Legislature had refused to make the bill "declaratory of existing law" contrary to the author's intent. As has been seen, at one time, the bill

mosa Beach, Redondo Beach, Santa Monica, Rancho Palos Verdes, Del Mar, Oxnard, San Francisco, Beverly Hills, Costa Mesa, Thousand Oaks, Downey, Arcadia, Montebello, Fullerton, Temple City, Corte Madera and Menlo Park.

[22]Senator Petris' declaration is a part of this court's file in the case of *California Coastal Com.* v. *Superior Court, supra*, (Cal.App.) hearing granted by the Supreme Court on May 29, 1980.

contained language which would have unequivocally permitted any governmental agency to have its assumption of jurisdiction over stock cooperatives validated. However, this provision was also amended by both houses in a significant way. When the qualifications of "legislative action" and "legislative enactment" were added, these last amendments were made on the floor of the Assembly subsequent to the committee hearings at which Senator Petris might have testified. An amendment of this nature strongly suggests that the intent expressed by the author of the bill was not shared by the majority of the Legislature who voted for Senate Bill No. 823. Under such circumstances, the declaration of Senator Petris, so meager in probative value, should be disregarded in the interest of sound public policy. It fails to communicate evidence of the understanding of the Legislature as a whole. To the contrary, although Senator Petris argued in favor of a bill reflecting his intent, he did not obtain the bill's passage in the form presented. This case is unlike *In re Marriage of Bouquet, supra,* 16 Cal.3d 583, at page 590, where the court upheld the acceptance of testimony of an assemblyman as an indicator of legislative intent "because the court was satisfied that the testimony was not an expression of his own opinion. . . but a reiteration of the discussion and events which transpired in the Assembly committee hearing when the amendments. . . were under consideration. [Citation.] Although Assemblyman Hayes did articulate his personal view that the statute operated retroactively, he also alluded to the argument that he had presented in securing the passage of the amendment." The terse declaration of Senator Petris does not meet that criterion. While it assists us in knowing what his individual intention was when he introduced the bill and what his argument was in committee at some unspecified time, his affidavit is singularly unhelpful as an index to illustrate the collective legislative intent when the bill emerged in its final form after substantial and drastic amendments. To ascertain such intent we are better served and more fully persuaded by an examination of the legislative history of the bill and the language of the statute as it finally emerged from the political process. Such study satisfies us that section 8, subdivision (b) does not validate the Commission's regulation of the stock cooperative conversions in issue.

 C. *A Stock Cooperative Conversion Is a "Division of Land" Under the Coastal Act.*

The Commission argues that even if it be held that a stock cooperative conversion is not a "subdivision" pursuant to the Subdivision Map Act, then it is necessarily within the purview of section 30106 of the

Public Resources Code which provides that a "change in the density or intensity of use of land" constituting a "development" subject to the Commission's jurisdiction also includes "*any other division of land* including lot splits." (Italics added.) At the trial, the court ruled that the phrase "any other division of land" refers only to the division of physical earth into units. The court was in error and the Commission's position should prevail.

Neither "division" nor "land" is defined in the Coastal Act. Each of these words are relatively commonplace in their ordinary and general meaning. ■ "Divide" has been defined as "to separate (a thing) into parts or...into smaller groups; to split up, cleave; to break or cut asunder." (1 Oxford English Dict. (compact ed. 1971) at p. 775.)

■ "Land" has been defined as "the solid portion of the earth's surface...ground or territory as owned by a person...." (*Id.* at pp. 1564-1565.)

In support of the court's order, respondents urge that the phrase "any other division of land" refers only to the physical partition of the earth's surface into units of a smaller area and that the everyday import of the term "land" and its legal treatment does not encompass the multiunit residential structures that rest upon such land. They draw attention to the distinction that has been made between the term "land" and the structures upon it by statutory treatment[23] and case holdings. (*City of Los Angeles v. Howard* (1937) 23 Cal.App.2d 624 [73 P.2d 1234]; *Rinaldi v. Goller* (1957) 48 Cal.2d 276 [309 P.2d 451].) They also assert that the phrase "division of land" cannot be construed as meaning every possible creation of a right of occupancy by pointing to the use of "lot splits" as the only example of what constitutes the type of division of land contemplated. In this connection, respondents rely upon the maxim of statutory construction which provides that where words of more general import are used in connection with words enumerating a more specific class of activities, the general words should be construed as referring only to activities of the same type as those enumerated.

---

[23]Civil Code section 658 provides in pertinent part: "Real or immovable property consists of: 1. Land; 2. That which is affixed to land;..."

Civil Code section 659 states: "Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance."

Civil Code section 660 provides in part: "A thing is deemed to be affixed to land when it is...permanently resting on it, as in the case of building;..."

(*Campbell* v. *Board of Dental Examiners, supra,* 53 Cal.App.3d 283; *Pasadena University* v. *Los Angeles Co.* (1923) 190 Cal. 786 [214 P. 868].)

These arguments are plausible and cogent but fail to convince when subjected to a scrutiny informed by the very doctrine of *ejusdem generis* upon which respondents rely. The basic flaw in this argument is that it reverses the principle of that doctrine. If Public Resources Code section 30106 merely read that a "development" is "a division of land including lot splits," respondents' construction of the phrase in question might carry greater persuasion. But that phrase does not stand in splendid isolation. On the contrary, it is embedded in, and interwoven with, a context dealing with changes in land use "including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Gov. Code), and *any other division of land,* including lot splits, . . ." (Italics added.) It is apparent that the words "any other division of land including lot splits" are juxtaposed and connected with the preceding reference to subdivisions under the Subdivision Map Act, which are likewise included within the meaning of "development" under the Coastal Act. Since those map act subdivisions "for the purpose of sale, lease or financing" subsume not only physical divisions of unimproved land but also the division of improved land in which interests may be created in entities such as condominiums and community apartments, among others, the use of the words "any other division of land," when read in context, conveys a meaning other and more comprehensive than mere physical partition of the terrain. ■ As stated in *People* v. *McKean* (1925) 76 Cal.App. 114, 119 [243 P. 898]: "'By the rule of construction known as "*ejusdem generis*," where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The particular words are presumed to describe certain species, and the general words to be used for the purpose of including other species of the same genus. The rule is based on the obvious reason that if the legislature had intended the general words to be used in their unrestricted sense they would have made no mention of the particular classes. The words "*other*" or "*any other,*" following an enumeration of particular classes, are therefore to be read as "other such like," and to include only others of like kind or character.'" (Second italics added.) In accord is *Scally* v. *Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806, 819 [100 Cal.Rptr. 501].

In arriving at this determination, we follow the principles that a statute is to be construed so as to give effect to all of its provisions (*Stewart* v. *Board of Medical Quality Assurance* (1978) 80 Cal.App.3d 172, 179 [143 Cal.Rptr. 641]) and that a restricted meaning should not be given to a word which would circumvent the evident purpose of the act when a permissibly broader meaning would carry out that purpose. (*In re Reineger* (1920) 184 Cal. 97, 103 [193 P. 81].) Within the matrix of this case, we cannot accept the parochial meaning of "division of land" attached to those words by respondents as being the exclusive meaning intended by the Legislature in defining a "development" under the Coastal Act. Words as conduits of thought are not immutably fixed, but take on the coloration and nuances of the milieu in which they appear. This concept is fully articulated in *Pearson* v. *State Social Welfare Board* (1960) 54 Cal.2d 184, 195 [5 Cal.Rptr. 553, 353 P.2d 33]: "As expressed by Mr. Justice Holmes in *Towne* v. *Eisner*, 245 U.S. 418, 425 [38 S.Ct. 158, 62 L.Ed. 372]; 'A "word" is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.' Words used in a statute may, as applied to the words with which they are combined and to the words with which they were intended to be related, have connotations which they might not have when used in context with, or in relation to, other language or where used to express a different purpose."[24]

As has already been shown, stock cooperatives have, since 1965, been treated together with condominiums and community apartments, as subdivided lands (Bus. & Prof. Code, § 11004.5). It is true that a stock cooperative is a hybrid species of ownership—consisting as it does of a combination of lease and ownership of corporate stock which together give the interest the traditional aspects of personalty, while the proprietary nature of the lease and the characteristics of home ownership benefits, which we have more fully described in section A, *ante*, provide a strong basis for classifying the interest involved as quasi-real property. (See *Estate of Pitts, supra*, 218 Cal. 184.) However, the proper categorization of a stock cooperative in terms of property inter-

---

[24]In their brief, respondents refer to the classic quotation from Alice in Wonderland regarding the *ipse dixit* assignment of meaning to words by Humpty Dumpty in a struggle to exert mastery over them. (*Cooper* v. *Swoap* (1974) 11 Cal.3d 856, 872 [115 Cal.Rptr. 1, 524 P.2d 97] (striking down an administrative regulation reducing aid to families with dependent children).) In *Tripp* v. *Swoap* (1976) 17 Cal.3d 671 [131 Cal.Rptr. 789, 552 P.2d 749], a case also dealing with a welfare regulation, the court emphasized that words must be read in context, keeping in mind the nature and obvious purpose of the statute in which they appear. (*Id.* at p. 679.)

ests is less imperative here than to recognize that it bears much the same characteristics as a condominium or a community apartment and has a similar impact on coastal zone development. It is exempted from the requirements of the Subdivision Map Act for the reasons stated in section A, *ante.* ▪▪▪ However, because in genre and gestalt it readily equates with a condominium or community apartment, we conclude that there is no compelling reason to suppose that a stock cooperative conversion was not meant to be included within the purview of the phrase "any other division of land" and sound priniçples of statutory construction operate strongly in favor of its inclusion. Section 30009 of the Public Resources Code specifies that the Coastal Act "shall be liberally construed to accomplish its purposes and objectives." One such objective is the protection of, and provision for, housing opportunities for low and moderate income persons within the coastal zone. (Pub. Resources Code, § 30213.) Conversion of existing apartments into stock cooperatives may have an impact of concern in this area of Commission interest. For all the reasons stated, we therefore hold that stock cooperative conversions are subject to the permit requirements of the coastal act as falling within the ambit of "any other division of land."[25]

▪▪▪ D. *The Commission's Assumption of Jurisdiction Over Stock Cooperative Conversions Does Not Contravene the Administrative Procedure Act.*

Respondents contend that the court's refusal to grant injunctive relief must be upheld by reason of the Commission's contravention of the provisions of the Administrative Procedure Act (Gov. Code, § 11370 et seq.) which govern the adoption of administrative agency regulations and by its violation of Public Resources Code section 30333 which requires rules and regulations of the Commission to be adopted in accordance with the Administrative Procedure Act (Gov. Code, § 11370 et seq.; hereafter sometimes referred to as APA). It argues that when the Commission determined to assert jurisdiction over stock cooperative conversion at its meeting of October 31, 1978, it was engaged in "regulation" as that term is used in section 11371, subdivision (b) of the APA[26] and was in wholesale violations of the APA by failing (1) to

---

[25]Senate Bill No. 823 and section 8 in particular does not purport by its terms to have any "grandfathering" effect on regulation other than those undertaken pursuant to the Subdivision Map Act and does not exempt the cooperative conversions here involved.

[26]At the time here pertinent section 11371, subdivision (b) of the APA read in part as follows: "'Regulation' means every rule, regulation, order, or standard of general application...adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it...."

maximize the opportunity for public participation in its proceedings in accordance with Public Resources Code section 30339 and (2) by failing to comply with the notice, information and presentation requirements embodied in APA sections 11423,[27] 11424 and 11425. They rely on the established rule that regulations enacted without adherance to the requirements of the APA are invalid. (*City of San Marco v. California Highway Com.* (1976) 60 Cal.App.3d 383 [131 Cal.Rptr. 804] (failure to give adequate notice or to permit interested parties to participate in formulation of a regulation).)

We are of the opinion that respondents misconceive the Commission's actions of October 31, 1978, in describing it as "regulating," nor do we view it as quasi-legislative in the sense that it was required to be promulgated through APA procedures.

The underlying problem with respondent's contention is that this lawsuit is not engendered to vindicate any regulations emanating from the Commission's actions of October 31, 1978, but is an action to enforce the provisions of the Coastal Act. Such an action at this stage of the proceedings posits solely a question of law—whether under the Coastal Act a stock cooperative conversion constitutes a "development" either as a "subdivision pursuant to the Subdivision Map Act" or as "any other division of land"—and an affirmative answer to that question subjects stock cooperative conversions to the Commission's permit jurisdiction. This is compelled by the imperative of the statute regardless of any determination or conclusion arrived at by the Commission. Under section 30803 of the Public Resources Code,[28] authority is extended to any person, not exclusively to the Commission, to initiate a lawsuit to enjoin an activity violative of the Coastal Act from taking place. A formal hearing in accordance with the APA procedures is not a condition precedent to determine whether the Commission is vested with jurisdiction over stock cooperative conversions. A lawsuit, by any person, suffices to raise the

[27]At the time here pertinent section 11423 of the APA read in part as follows: "At least 30 days prior to the hearing on the adoption, amendment, or repeal of a regulation, notice of the proposed action shall be: [¶] (a) Published in such newspaper of general circulation, trade or industry publication, as the state agency shall prescribe. [¶] (b) Filed with the Senate Committee on Rules and the Speaker of the Assembly. [¶] (c) Mailed to every person who has filed a request for notice thereof with the state agency. [¶]...[¶] (e) When appropriate in the judgment of the state agency, (1) mailed to any person or group of persons whom the agency believes to be interested in the proposed action.... [¶] (f) Published in the California Administrative Register...."

[28]Public Resources Code section 30803 provides in pertinent part: "Any person may maintain an action for declaratory and equitable relief to restrain any violation of this division. On a prima facie showing of a violation of this division, preliminary equitable relief shall be issued to restrain any further violation of this division...."

issues here involved. By statutory mandate, the Commission is empowered to bring this action to enjoin a stock cooperative conversion in the coastal zone when a coastal development permit has not been obtained. (Pub. Resources Code, § 30600, subd. (a).) On the showing made, the Commission is entitled to a preliminary injunction to preserve the status quo until a plenary determination on the merits can be accomplished in the main action.

### *Disposition*

The order denying a preliminary injunction is reversed with directions to grant the application.

Spencer, P. J., concurred.

**HANSON (Thaxton), J.**—I respectfully dissent. I would affirm the order of the superior court denying the California Coastal Commission (hereinafter Commission) a preliminary injunction.

Section 30106 of the California Coastal Act (hereinafter section 30106) provides: "'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), *and any other division of land, including lot splits*, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511). [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (Italics added.)

The majority opinion's reversal of the order denying a preliminary injunction to the Commission focuses on the words "any other division of

land" in section 30106 and concludes that the creation of stock coopera-
tives constitutes a "division of land" within the meaning of the act
which vests the Commission with jurisdiction. I disagree.

I agree with Superior Court Judge Robert I. Weil's conclusion in
denying the Commission a preliminary injunction that the word "devel-
opment," as defined in section 30106, does not include stock coopera-
tives nor does the creation of the stock cooperative constitute "any other
division of land" within the meaning of that section.

As noted in the majority opinion, neither "division" nor "land" is de-
fined in the Coastal Act. Absent some clear expression of legislative
intent, the statute must be construed to give effect to these words in ac-
cordance with their plain, usual and ordinary import. (*Palos Verdes
Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21
Cal.3d 650 [147 Cal.Rptr. 359, 580 P.2d 1150]; *Estate of Tkachuk*
(1977) 73 Cal.App.3d 14 [139 Cal.Rptr. 55]; *Addison* v. *Department of
Motor Vehicles* (1977) 69 Cal.App.3d 486 [138 Cal.Rptr. 185].)

The word "division" is "the act or process of *dividing*: the state of be-
ing *divided*." (Webster's New Collegiate Dict. (7th ed. 1970) p. 245.)
"Divide" means "to separate into two or more parts, areas or groups
. . .to cause to be separate, distinct, or apart from one another. . . ."
(*Id.*, at p. 244.) The 1 Oxford English Dictionary (compact ed. 1971)
defines "divide" as "To separate (a thing) into parts or. . .into smaller
groups; to split up, cleave, to break or cut asunder." (P. 775.)

Applying the above definitions of "division" and "divide," it is clear
that section 30106 does not vest the Commission with jurisdiction.
Stock cooperative conversions of existing structures do nothing what-
ever to the land underlying them and do not break up either the
ownership or leasehold interests into units smaller than what existed be-
fore. Nor is anything else divided by the conversion of an existing
apartment building to a stock cooperative. Both before and after, own-
ership of the entire project is unitary and title to all is held by a single
entity. (Bus. & Prof. Code, § 11003.2.) Prior to conversion, individual
units are occupied separately, frequently by lease; afterward they are
still occupied separately, still under lease. Neither the land nor the indi-
vidual apartments is carved up into separate parcels, or separate
ownerships. The various units are not divided into separate parts, i.e.,
bedroom, kitchen, front closet. There simply is no "division" of
anything.

However, assuming, arguendo, the word "division" applied to the residential units involved, it is clear there is no division of land within the meaning of section 30106.

"Land" in common usage refers to "the solid part of the surface of the earth; *specific*: the surface of the earth and all its natural resources." (Webster's New Collegiate Dict., *supra*, p. 473, italics added.) The 1 Oxford English Dictionary, *supra*, defines it as "The solid portion of the earth's surface...Ground or territory as owned by a person...." (Pp. 1564-1565.)

I construe the word "land" as used in section 30106 to mean the physical surface of the earth as distinguished from "real property" which includes the land and the existing structures affixed thereto. (See Civ. Code, §§ 658, 659, 660; see also *Los Angeles* v. *Howard* (1937) 23 Cal.App.2d 624 [73 P.2d 1234]; *Rinaldi* v. *Goller* (1957) 48 Cal.2d 276 [309 P.2d 451]; *Kolstad* v. *Ghidotty* (1963) 212 Cal.App.2d 228 [28 Cal.Rptr. 123].)

This distinction appears in the definition of "development" in both the 1972 and 1976 Coastal Act. In 1976 the Attorney General specifically determined that a stock cooperative conversion was not a "division of land" and that the Commission does not have the jurisdiction it claims here.[1] The Legislature thereafter reenacted the relevant portion of the act's "development" definition without change. If the Legislature had wished to alter this conclusion, it would have been easy for it to say that "development" includes "Any other division of land, or the ownership or right of occupancy thereof, or change in the form of ownership or occupancy thereof, including lot splits or stock cooperative conversions...." Accordingly, it is reasonable to conclude that the Legislature did not intend to include stock cooperative conversions in the Coastal Act's reference to "any other division of land" at the time section 30106 was enacted in 1976.

---

[1]The Attorney General's opinion that the Commission does not have jurisdiction over cooperative conversions includes the following discussion: "Since the phrase 'any other division of land' is not expressly defined in the Coastal Act, it must be interpreted using settled rules of statutory construction...Generally, words in a statute should be given their ordinary meaning unless otherwise clearly intended or indicated. [Citation.] The word 'land' in its most general sense, means any ground, soil or earth whatsoever ...Ordinarily, it connotes the subject of ownership and not the ownership itself. [Citation.] Therefore, interpreting the word 'land' in its ordinary sense, the conversion of an existing apartment to a stock cooperative form of ownership would not be included as a divison of land and therefore would not be a development under the Coastal Act.... (Cal. Atty. Gen. Indexed Letters, No. IL76-133 (July 21, 1976),.)"

The language of the Coastal Act's definition of "development" (identical in the 1972 and 1976 versions) indicates that the Legislature maintained a distinction between actions done to *land* itself and actions done to structures on land. After referring to division of *land*, the definition continues to say that "development" includes: "[c]onstruction, reconstruction, demolition or alteration of the size of any structure...." (Pub. Resources Code, § 30106 [formerly § 27103].) All of the foregoing activities refer to physical impact on the land by changing the physical nature or extent of what rests on it. It is logical to conclude that the Legislature did not intend the Commission to regulate the nonphysical activities relating to structures such as the legal terms under which they are leased.

Moreover, the term "develop" or "development" used in section 30106, "...connotes the act of *converting* a tract of *land* into an area *suitable* for residential or business uses." (*Winkelman* v. *City of Tiburon* (1973) 32 Cal.App.3d 834, 843 [108 Cal.Rptr. 415], italics added.)

Of no little significance is the fact that the statute includes "lot splits" as the only example of what constitutes an "other division of land" which is evidence that the legislative focus was on the actual partitioning of the land itself, rather than every possible creation of a right of occupancy which the Commission might wish to regulate under section 30106.

In my view the same reasons that the majority opinion concludes that stock cooperatives are excluded from the coverage of the Subdivision Map Act are applicable in respect to section 30106. As noted in the majority opinion, the stock cooperative, an entity far older than the condominium and community apartment concepts, "was put under the Real Estate Commissioner's jurisdiction in 1965, two years after the latter two concepts were mentioned in the map act. It would have been a simple matter for the Legislature to have likewise included the stock cooperative at that time as part of the map act. Its failure to do so, and the clear distinction that the Legislature consistently made between stock cooperatives and the condominium and community apartments until the advent of Senate Bill No. 823, strongly suggests that the stock cooperatives were deliberately excluded from the coverage of the map act."

I fail to see the logic and consistency in the majority opinion which first concludes that the stock cooperative *is not* included in the map act (with which I agree) and then concludes that the stock cooperative *is* included in section 30106 because the words "any other division of land, including lot splits" must be interpreted in juxtaposition with the Subdivision Map Act.

Nor does the fact that an amendment of section 66424 of the Government Code became effective January 1, 1980 (Sen. Bill No. 823), making stock cooperative conversions of five or more dwellings subject to the provisions of the Subdivision Map Act, change the result in respect to the parties herein. The Commission's regulatory powers should not be expanded by court edict unless or until the state Legislature specifically and constitutionally vests it with such powers since the Commission is tinkering with individual property and contract rights which are constitutionally protected.

*Stanson v. San Diego Coast Regional Com.* (1980) 101 Cal.App.3d 38 [161 Cal.Rptr. 392], involved the desire of an owner of a commercial building within the protected coastal zone to remodel the building to include a second floor restaurant. (It should be noted in the instant case there is no remodeling or change in the existing structure whatsoever involved in the conversion to a stock cooperative.) The Court of Appeal reversed the superior court's denial of plaintiff property owner's petition for a writ of mandate following the Coastal Commission's denial of a permit to remodel the building on the ground that the property owner had acquired a fundamental vested right rooted in the constitutional protection against deprivation of property rights without due process of law.

However, in *Stanson* the court also discussed the words "change in the density or intensity of use of land" contained in section 30106 indicating that "There is precedent that the policy of the [Coastal] Act requires the agency to consider cumulative impacts before granting approval of a project. [Citations.]" (101 Cal.App.3d at p. 48.) The foregoing language in *Stanson* is inapplicable by reason of the nature and procedural posture of the case at bench. The Commission in the instant case in seeking a preliminary injunction initially argued before the superior court that the conversion to a stock cooperative effects a "change in the density and intensity of use of Land" as a separate reason why it had jurisdiction in the first instance as distinguished from whether or not a permit should be granted assuming jurisdiction. The

Commission later abandoned that argument before the trial court as a basis for establishing jurisdiction by asserting that while it believed *the cumulative effect* of such stock cooperative conversions would constitute a "change in the density and intensity of the use of land," it "recognize[d] that any *given* cooperative conversion might not individually have that effect." Since that issue was not before the trial court, it is not before this court.

By reason of the foregoing, I conclude that the cooperative conversion involved in the instant case is not a "division of land" either as that term must be generally understood or as it was intended to be used by the Legislature in section 30106 as enacted in 1976.

Petitions for a rehearing were denied January 16, 1981. Hanson (Thaxton), J., was of the opinion that the petitions should be granted. The petitions of interveners and respondents for a hearing by the Supreme Court were denied February 18, 1981.